## 𝔅𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

### BEURY AND OTHERS V. DAVIS.

March 10, 1910.

Reheard January 12, 1911.

1. PRINCIPAL AND AGENT—*Failure to Establish the Relation—Case in Judgment.*—Upon the evidence in this cause, it is *held* that the suit was founded upon the theory that the plaintiff was entitled to a certain commission for services rendered by him for the defendants as their agent in effecting a sale of the lands described in the bill, whereas it clearly appears from the record that the relation of principal and agent did not exist, and hence there can be no recovery of commissions.

Appeal from a decree of the Circuit Court of Alleghany county. Decree for the complainant. Defendants appeal.

*Reversed.*

The opinion states the case.

*William E. Allen, Wm. A. Glasgow, Jr.,* and *Holt & Duncan,* for the appellants.

*Braxton & McCoy, Ker & Kerr, C. C. Watts, Mallohan, McClintic & Mathews, Moore, Barbour & Keith, W. H. Saunders* and *E. W. Knight,* for the appellee.

KEITH, P.*

---

*At the first hearing of this case Judge Buchanan was absent, and an opinion was handed down by KEITH, P., which was concurred in by all the judges present. On the rehearing, KEITH, P., adhered to his original opinion and with him CARDWELL, J., concurred. The other three judges concurred in the results only. The opinions are published in the order in which they were delivered.

D. C. T. Davis, Jr., sued out an attachment in equity against Julia A. Beury and others, the widow and heirs at law of Joseph L. Beury, deceased, in the Circuit Court of Alleghany county, and caused it to be levied upon the property of the defendants within the jurisdiction of that court. Numerous objections were made to this proceeding, all of which the court overruled. The parties defendant subsequently appeared and filed their answer, and upon the pleadings and proofs a decree was rendered against them for the sum of $65,002, with interest from February 1, 1906, until paid. To that decree an appeal was awarded, and the case is now before us for review.

We shall, without expressing any opinion upon many of the assignments of error, discuss and decide the case upon its merits.

The facts which we deem material are as follows: Joseph L. Beury, a citizen of West Virginia, died intestate, leaving a large estate, consisting of real and personal property. Included in this estate were one hundred or more contiguous tracts of land, lying chiefly in Greenbrier county, West Virginia, comprising about 32,000 acres, and known as the "Meadow River" lands. The decedent left surviving him a widow, Julia A. Beury, and four children, who became the sole owners of his estate.

A chancery suit was brought in the Circuit Court of Fayette county, West Virginia, for the settlement of the estate of Joseph L. Beury, and for division between his widow and heirs after the payment of his debts, which were very considerable in amount. On July 8, 1905, while this chancery suit was pending, the widow and heirs gave an option for thirty days to D. C. T. Davis, Jr., to purchase the Meadow river lands at $27.00 per acre, upon terms specified in the contract. Having obtained this option, Davis opened negotiations with D. A. Langhorne, and on the 2d of August, 1905, entered into an agreement with him to purchase the

lands at the option price of $27.00 per acre, with the understanding that when so purchased the lands were to be conveyed to Davis, as trustee for Langhorne, and that Davis was to have charge of remarketing the lands, and have one-fourth of any profit resulting from the transaction, and there was an understanding between them that Langhorne should have an interest in any commission which the Beurys might agree to pay Davis for making the sale. This contract, it is claimed, was solely between Davis and Langhorne; that the Beurys were neither parties nor privies to it; that they had no knowledge of, interest in, or rights under, it; and that it could have been modified or abandoned by mutual consent of Davis and Langhorne, at any time they chose so to do, and it was their purpose not to act upon it unless the Beurys would agree to pay Davis a commission of $2.00 per acre for making the sale. Davis and Langhorne, on the night of August 2d, went to Lewisburg, W. Va., and on August 3d, after reducing their contract to writing, Davis sent a message by telephone to John H. Holt, Esq., counsel for the Beurys, at Charleston, W. Va., that he felt sure that he could close the contract of purchase under the option at once, provided he could receive $2.00 per acre commission, so as to net the Beurys $25.00 per acre. Mr. Holt replied that he thought this arrangement would be satisfactory to the Beurys, and Davis and Langhorne went immediately to Charleston, where on August 4th they met the Beurys and Mr. Holt, their counsel, in conference.

Mr. Holt, as counsel for the Beurys, it is alleged, proposed to Mr. Davis that, instead of selling the land to Langhorne for $27.00 and giving Davis a commission of $2.00 per acre, the sale be made to Langhorne for $25.00 per acre, and that Davis should look to Langhorne for his commissions. This arrangement, however, Davis declined, and thereupon the Beurys entered into a written contract with him as follows:

"In consideration of D. C. T. Davis, Jr., selling for us about 30,000 acres of land and mineral rights to D. C. T. Davis, Jr.,

trustee for D. A. Langhorne, on this the 4th day of August, 1905, we agree to pay him $2.00 per acre for each and every acre so sold as the same is paid for, and authorize the said Davis to hold said amount out of the purchase money as aforesaid." Signed by Julia A. Beury and her children, the heirs at law of Joseph L. Beury, deceased.

On the same day the foregoing paper was executed the Beurys entered into a written contract with Langhorne, whereby they sold and agreed to convey to him the said Meadow river lands at the price of $27.00 per acre, and received a $10,000 cash payment as a part of the purchase money. At a subsequent day, Langhorne paid an additional sum of $10,000 on account of this purchase, and called upon the Beurys to furnish him promptly with abstracts of title of the various parcels constituting the Meadow river lands, in accordance with their contract. Davis, as attorney for Langhorne, was then directed and undertook to inspect and pass upon the titles. He found the titles to many of the parcels defective, and called upon the Beurys to make these titles good. The Beurys contended that their contract with Langhorne did not call for a good title, but merely for a good deed, and that they had fully performed their obligation thereunder when they tendered to Langhorne a deed which was good as to form. This proposition was repudiated by Langhorne and Davis, and extensive conferences and correspondence took place between them and the Beurys.

While these negotiations were in progress, the suit was still pending in the Circuit Court of Fayette county for the settlement of Beury's estate, and the creditors had become impatient and the necessity for the sale of the property involved had become urgent. On December 11, 1905, the Beurys served notice upon Davis and Langhorne, that in accordance with their understanding of the terms of the contract of the 4th of August, 1905, they had executed and acknowledged a deed with covenants of general warranty of title, conveying to

Davis, trustee, the lands in controversy, which deed would have been executed on the 7th of October, 1905, but for the request of Davis that the same be not then executed, and stating that the Beurys had stood ready and willing since the 7th of October, 1905, to execute and deliver the deed in accordance with the terms of their contract. The notice then continues as follows:

"You will further take notice that said deed is now tendered to you, upon your making the cash payment and executing the notes therein mentioned and described; and you may, out of the cash payment, take up the escrow deeds conveying certain of said lands to the late J. L. Beury, of which you have had knowledge during these negotiations.

"You will further take notice that, in the event you do not now accept said deed and make said cash payment and execute the said notes, we shall leave the said deed at the Charleston National Bank, in the city of Charleston, Kanawha county, West Virginia, in escrow, until 12 o'clock noon on Saturday, December 16, 1905, until which time you may take the said deed by paying the said cash payment to the said bank, for us, and executing and delivering to the said bank, for us, the said deferred payment notes mentioned in said deed. And, in making settlement at said bank, the same proposition regarding the taking up of the escrow deeds aforesaid will apply.

"We hereby tender to you the ten thousand dollars paid to A. S. Guthrie, agent, as set forth in said contract of August 4, 1905, the same not having been used for the purposes set forth in said contract. If the said deed is not accepted by you and the cash payment made, and the deferred payment notes executed on or before 12 o'clock noon on December 16, 1905, the said contract of August 4, 1905, will be at an end, and all your rights thereunder shall cease, and we will not thereafter recognize the same as binding upon us."

It is to be observed that by the contract of August 4, 1905,

known as the "Commission Contract," Davis became the agent of the Beurys for the sale of certain lands, for which service they were to pay him the sum of $2.00 per acre "for each and every acre so sold as the same is paid for." Davis, as the purchaser and holder of an option from the Beurys, had at the time he entered into the contract of August 4, 1905, already agreed upon a sale of these lands to Langhorne, of which fact the Beurys do not appear to have been informed. It further appears that these lands were purchased by Langhorne for speculative purposes, and that it was understood and agreed between Langhorne and Davis that one-fourth of whatever profit might be realized from the purchase and sale of these lands was to be for the benefit of Davis; and, further, that it was understood between Davis and Langhorne in Richmond, prior to August 4, 1905, that whatever commission the Beurys might agree to pay was to be divided between Langhorne and Davis. The proportion in which that commission was to be divided did not at first appear, but it is subsequently stated that it was to be divided in equal parts. So that the arrangement between Davis and Langhorne made them *equal* participants in whatever gain might be made in the venture, both in respect to the commissions to be received by Davis and the profit which it was hoped would be realized from the resale of the lands. These possible profits and expected commissions together constituted the entire interest which Davis and Langhorne could have in the transaction in which they were about to enter, the purchase and sale of these lands.

It is contended upon the part of appellants, that by reason of the facts we have stated Davis, as the agent of the Beurys, had come to occupy such an attitude toward them and had assumed such relations towards Langhorne and the subject matter of his agency as renders the contract for the sale of the lands voidable at their election, and precludes him from being entitled to any compensation as their agent.

On behalf of the appellee it is contended, that Davis, with the knowledge of the Beurys, sold these lands to himself as trustee for Langhorne, an ascertained purchaser, at a fixed price, and that every material fact touching the transaction was communicated to or known by the Beurys.

The record does not show that Davis made a full disclosure of his relations to the transaction to his principals. Those relations should not have been left to conjecture and inference, but Davis should have stated frankly and fully to the Beurys the engagements he had entered into and the relations he had assumed towards Langhorne. Under the option contract of July 8, 1905, Davis stood in no fiduciary relation to the Beurys, but in consequence of an agreement made with Langhorne, to whom he had already agreed upon a sale and transfer of his rights under the option contract at $27.00 per acre, he approached the Beurys and secured the "Commission Contract" of August 4, 1905. He did not disclose to the Beurys that he had already come to an agreement with Langhorne, nor was he under any obligation to disclose that fact to them until he entered into the negotiations which resulted in his becoming their agent for the sale of the lands, to be compensated by them as their agent for that service; but before changing his attitude of optionee—a relation, if not of open antagonism to the Beurys, one which was certainly not of a fiduciary character—to become their agent, thus altering his whole attitude toward the situation, and one imposing the utmost good faith upon him in his dealings with his principals, he should have explicitly informed them that he had already made a sale to Langhorne at $27.00 an acre. Instead of doing this, his conduct was such as to induce the reasonable belief upon the part of the Beurys that their entering into the "Commission Contract" was a necessary condition to the consummation of the sale to Langhorne. Such may have been the case, but the Beurys were entitled to know the facts, so as to determine how far it was consistent with their interest

to employ as agent a person holding such relations to the prospective purchaser. In a yet higher degree was it the duty of Davis frankly to have disclosed his interest in the purchase and Langhorne's interest in the commissions. This property was being purchased with a view to speculation—in other words, with the hope of selling it at an advanced price—and Davis, the agent of the Beurys, the vendors, was jointly interested with Langhorne in the purchase; Langhorne was to have one-half of the commissions, Davis one-fourth of the profits. The commissions and the profits constituting the entire interest which Davis and Langhorne could have in the transaction.

Here, then, was a complete identity of interest between Langhorne, the purchaser, and Davis, the agent for the sellers. We have no doubt that it was the duty of Davis to communicate these facts to his principals. It is not enough to say that he thought they were fully advised of all the facts; it is not sufficient to be able to point out circumstances from which an inference may be drawn that the principals or their attorneys at law knew or had means of knowledge. No agent was under so high an obligation to impart information appertaining to his own conduct, to his own antagonistic relations to the subject of his agency, as Davis himself was, and nothing short of a full disclosure to his principals will satisfy the duty of good faith which the law imposes upon one so situated.

It is true that he was an agent to sell to an ascertained purchaser at an agreed price, but it was none the less his duty to place his principals in full possession of the facts bearing upon his personal interest in and relations to the subject and toward the prospective purchaser. It may be true that the Beurys suffered no injury by reason of their igno- rance of the facts, but the law makes no such inquiry. In order to remove temptation from the path of agents, as far as can be done, it stamps, from motives of public policy, all such dealings with the seal of its condemnation.

These views are fully sustained by adjudicated cases and text-writers.

In *Halsey* v. *Monteiro*, 92 Va. 581, 24 S. E. 258, this court, dealing with the duty of real estate brokers or agents, speaks as follows: "An agent to sell cannot become a purchaser, except after the fullest disclosure to his principal of all facts which may affect his interest. The relation between the parties is one of trust and confidence, and the utmost good faith is exacted of the agent. He cannot sign a contract for the sale of the principal's land when he is himself interested as purchaser. If such contract be made by the agent, the principal will not be held to a ratification thereof, except after full knowledge of all the material facts. If these be either suppressed or unknown, the ratification will be treated as invalid, because founded in fraud or mistake."

In *Ferguson* v. *Gooch*, 94 Va. 1, 26 S. E. 397, 40 L. R. A. 234, Judge Buchanan, in the course of the opinion, says: "Nothing is better settled than that a man cannot be the agent of both the seller and the buyer in the same transaction, without the intelligent consent of both. Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity, and ability is the main consideration in the selection of agents, and so careful is the law in guarding this fiduciary relation that it will not allow an agent to act for himself and his principal, nor to act for two principals on opposite sides in the same transaction. All such transactions are voidable, and may be repudiated by the principal, without showing that he was injured. In such cases the amount of consideration, the absence of undue advantage, and other like features are wholly immaterial. Nothing will defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts. Actual injury is not the principle upon which the law holds such transactions voidable. The chief object of the principle is not to compel restitution where actual fraud has been committed,

or unjust advantage gained, but it is to prevent the agent from putting himself in a position 'in which to be honest must be a strain on him,' and to elevate him 'to a position where he cannot be tempted to betray his principal.' 'Under a less stringent rule,' it was said by the court in *Parlin* v. *Woodruff*, 36 N. J. Eq. 174, 180, 'fraud might be committed, or unfair advantage taken, and yet owing to the imperfections of the best human institutions, the injured party be unable either to discover it or to prove it in such manner as to entitle him to redress. To guard against this uncertainty, all possible temptation is removed, and the prohibition against an agent acting in a dual character is made broad enough to cover all his transactions. The rights of the principal will not be changed, nor the capacity of the agent enlarged, by the fact that the agent is not invested with a discretion, but simply acts under an authority to purchase a particular article at a specified price, or to sell a particular article at the market price. No such distinction is recognized by the adjudications, nor can it be established without removing an important safeguard against fraud.' [Citing a number of cases.]

"It is claimed that it was at that time common for real estate agents in that city to get up syndicates to buy property in their hands for sale. No such custom or usage is proved, and if it were it could not avail unless it were clearly shown (and it was not), if then, that the members of the syndicate, many of whom did not live in or near Roanoke city, had knowledge of the usage or custom when Powell and Company became their agents. To be secretly in the service of the opposite party, while the agent is acting ostensibly for his principal only, is a fraud upon the latter and a breach of public morals which the law will not permit."

Speaking of the relation of principal and agent, at section 959 of Pomeroy's Eq. Jur., it is said: "Equity regards and treats this relation in the same general manner, and with nearly the same strictness, as that of trustee and beneficiary.

The underlying thought is that an agent should not unite his personal and his representative characters in the same transaction; and equity will not permit him to be exposed to the temptation, or brought into a situation where his own personal interests conflict with the interests of his principal, and with the duties which he owes to his principal. In dealings without the intervention of his principal, if an agent for the purpose of selling property of the principal purchases it himself, or an agent for the purpose of buying property for the principal buys it from himself, either directly or through the instrumentality of a third person, the sale or purchase is voidable; it will always be set aside at the option of the principal; the amount of consideration, the absence of undue advantage, and other similar features are wholly immaterial; nothing will defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts. * * * The mere fact that a reasonable consideration is paid, and that no undue advantage is taken, is not of itself sufficient. Any unfairness, any underhanded dealing, any use of knowledge not communicated to the principal, any lack of the perfect good faith which equity requires, renders the transaction voidable, so that it will be set aside at the option of the principal. If, on the other hand, the agent imparted all his own knowledge concerning the matter, and advised his principal with candor and disinterestedness, as though he himself were a stranger to the bargain, and paid a fair price, and the principal on his side acted with full knowledge of the subject-matter of the transaction and of the person with whom he was dealing, and gave a full and free consent,—if all these are affirmatively proved, the presumption is overcome, and the transaction is valid."

The same author, at section 1077, treating of the duty of an agent not to assume any position, enter into any relation, or do any act inconsistent with the interests of his beneficiary, states the law as follows: "This rule is of wide application,

and extends to every variety of circumstances. It rests upon the principle that as long as the confidential relation lasts the trustee or other fiduciary owes an undivided duty to his beneficiary, and cannot place himself in any other position which would subject him to conflicting duties, or expose him to the temptation of acting contrary to the best interests of his original *cestui que trust*. The rule applies alike to agents, partners, guardians, executors and administrators, directors and managing officers of corporations, as well as to technical trustees. The most important phase of this rule is that which forbids trustees and all other fiduciaries from dealing in their own behalf with respect to matters involved in the trust, and this prohibition operates irrespectively of the good faith or bad faith of such dealing. It is therefore a gross violation of his duty for any trustee or director, acting in his fiduciary capacity, to enter into any contract with himself connected with the trust or its management; such a contract is voidable and may be defeated or set aside at the suit of the beneficiary."

Clark and Skyles on Agency, at section 407, is to the same effect: "If an agent is employed to sell or lease property of his principal, he cannot sell or lease, directly or indirectly, to himself, without the principal's knowledge and consent, or unless his relations with the principal have been terminated. If he does so, the principal may set the transaction aside and recover the property, or if sold to a *bona fide* purchaser compel him to account for the proceeds, and it will be no defense for the agent to show that he acted in good faith, and that the transaction was in fact for the best interest of the principal. The law does not inquire in such a case whether there was any fraud, but gives the principal the absolute right to repudiate the transaction, because it will not allow an agent to take a position which is so inconsistent with his duty to his principal. And this is true notwithstanding the power to sell was executed upon a valuable consideration, paid by the agent. 'The law does not presume that such a transaction

will always be impressed with fraud, but it furnishes an inducement to fraud, and affords opportunities to persons, who should always act with the most conscientious and scrupulous good faith, to abuse their trust; and therefore a total disability is enjoined, to take away all temptation." *Grumley* v. *Webb,* 44 Mo. 444, 100 Am. Dec. 304.

It is therefore not necessary in this case, either to impute or to establish actual fraud, but the disability is enjoined and established by law in order to take away the temptation to the commission of fraud. In the statement of facts we have shown that Davis and Langhorne had identical interests in this whole transaction; that Davis was interested to the extent of one-fourth in the declared object with which the purchase by Langhorne was made—the hope and expectation of being able to sell the land which he purchased at an advanced price—and when a disagreement arose between the parties as to the proper construction of the contracts between them, Davis appears as the attorney and counsel for the purchaser, and upon objections made by him as to the title, which it seems might have been in great part if not altogether removed, the consummation of the contract for the sale of the land was defeated. The evidence fails to show that there was a full and free disclosure of all these facts and circumstances to the Beurys, and we are of opinion that Davis has not shown himself entitled to the commissions which he claims.

The decree of the circuit court must, therefore, be reversed, the bill of complaint dismissed, and the appellants recover their costs in this behalf expended.

UPON A REHEARING.

KEITH, P.:

This case was decided at the March term, 1910. The decree then entered was set aside upon a petition to rehear, and

the case was re-argued at the November term, 1910, of this court.

After a careful consideration of the whole subject, the court is unanimously of the opinion that the conclusion reached at the former hearing, that the decision of the circuit court should be reversed and the bill dismissed, was right; but a majority of the court do not concur in the opinion heretofore filed, their view of the case being that the suit was founded upon the theory that the plaintiff was entitled to a certain commission for services rendered by him for the defendants as their agent in effecting a sale of the lands described in the bill, whereas, in the opinion of the majority, it clearly appears from the record that the relation of principal and agent did not exist, and consequently there could be no recovery of commissions.

I again file the opinion heretofore rendered as expressing my view of the facts and the law.

The decree of the circuit court must be reversed and the bill dismissed with costs.

CARDWELL, J., concurs with KEITH, P.

BUCHANAN, HARRISON and WHITTLE, JJ., concur in results only.

*Reversed.*