# Wytheville.

## CERRIGLIO v. PETTIT.

### June 13, 1912.

1. FALSE REPRESENTATIONS—*Reliance—Evidence.*—If the purchaser of real estate had not equal means of information with the vendor as to the value of the property, its rental value, and its loan value, and the vendor made representations as to such values, but, when sued for deceit, asserts that his representations were not relied on by the purchaser, the evidence to show that he did not rely upon them must be of the clearest and most satisfactory character, and not of mere inference or implication.

2. VENDOR AND PURCHASER—*Agent of Both—Ignorance of Purchaser—False Representations.*—Where the purchaser of real estate is induced by the false representations of one whom he had employed as his agent to negotiate the purchase, but who was, without his knowledge, the paid agent of the vendor to make the sale, then the vendor is as much bound by the representations made by such agent as if they had been made by himself. It is immaterial that the agent was himself honestly deceived by the vendor.

3. FALSE REPRESENTATIONS—*Statement of Offers.*—When the vendor of property states that he has been offered a given sum for it, the statement is one of fact, and is material, as the chief element of the value of property is the readiness with which it may be sold.

4. FALSE REPRESENTATIONS—*Fraud—Action of Deceit—Relief in Equity.*—If one represents as true what he knows to be false, in such a way as to induce a reasonable man to believe it, and the representation is meant to be acted on, and he to whom the representation is made, believing it true, acts on it, and, in consequence thereof, sustains damage, there is such fraud as will support an action for deceit at law, or a bill for a rescission of the transaction in equity. Whether the misrepresentation is made innocently or knowingly, if acted on, the effect is the same. In the one case, the fraud is constructive; in the other, it is actual.

5. FALSE REPRESENTATION—*Inquiry.*—One to whom a representation has been made is entitled to rely upon it *quoad* the maker, and need make no further inquiry.

6. INSTRUCTIONS—*Ignoring Material Facts.*—An instruction which emphasizes one fact or set of facts, and leaves out of view altogether other

important facts necessary to be considered by the jury in order to arrive at a correct verdict, is erroneous, and hence should not be given.

7. EVIDENCE—*Relevancy.*—In an action of deceit to recover damages for false representations made by the defendant as to the value of real estate he has exchanged with the plaintiff, evidence that a predecessor in title of the plaintiff had "tricked" a third person into making a large loan on the property subsequently purchased by the plaintiff is wholly irrelevant.

8. FRAUD—*Delaying Suit—Estoppel—Waiver.*—A party who thinks he has been defrauded in a transaction has the right to take the time necessary to inform himself as to whether or not he has any redress, and if, when advised that he has a remedy at law, he brings his action within a few months, the doctrine of waiver or estoppel does not apply.

Error to a judgment of the Circuit Court of Fairfax county in an action of trespass on the case. Judgment for the defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Charles Poe, C. N. Ford,* and *Moore, Barbour, Keith & McCandlish,* for the plaintiff in error.

*C. E. Nicol,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This action was brought by Antonio Cerriglio to recover damages resulting from fraud and deceit alleged to have been practiced upon him by the defendant, R. M. Pettit, in an exchange of properties made between them on the 7th day of January, 1909.

At a trial of the cause there was a verdict and judgment for the defendant, which judgment we are asked to review and reverse, (1) because of misdirection of the jury by instructions given, and for error in refusing other instructions asked for by the plaintiff; (2) for error in allowing certain improper and irrelevant evidence to be submitted to the jury; and (3) because the verdict is contrary to the law and the evidence.

The material facts which the evidence proved, or tended to prove, and which have to be considered in connection with the assignments of error with respect to the court's rulings in giving and refusing instructions, are as follows: Cerriglio owned a farm in Fairfax county, Virginia, containing 804 acres, with extensive and costly buildings thereon, known as "Hayfield," situated about six miles from Alexandria city and fourteen miles from Washington, D. C., which points are accessible by good roads, and also about two miles distant from Franconia station, on the R., F. & P. railroad. Upon the Hayfield farm there was a large quantity of valuable personal property, the larger part of which belonged to the foreman on the place, named Thompson, but the personalty owned by Thompson was purchased by Cerriglio and was included in the exchange. Pettit was the owner of a lot in the city of Pittsburgh, Pennsylvania, with a dwelling and other improvements thereon, known as "1238 Fayette street."

Cerriglio and Pettit were brought together through real estate agents in the city of Washington, D. C., and the exchange of their respective properties was there consummated. Pettit was represented by the real estate firm of Ballard & Lanham Co., and Cerriglio by Frank A. Harrison, but, as we shall later see, there is proof in the record going to show that Harrison, at the time of the negotiations and the closing of the deal between said contracting parties, was also in the employ and pay of Pettit, without the knowledge of Cerriglio.

Hayfield, at the time of the exchange, was incumbered by a deed of trust, securing a balance of $28,500, due to one Thomas Cover, of Winchester, Va., on a loan of $32,000 to Cerriglio's predecessor in ownership, which Cerriglio assumed as part payment of his purchase of the property, but which he had reduced by payment to said sum of $28,500; and the real estate of Pettit, at the time of the exchange, was subject to a mortgage amounting to $8,000. The personal property on Hayfield was transferred by Cerriglio to Pettit free of incumbrance, and consisted in part of property owned by the foreman on the Hayfield farm, which Cerriglio had purchased in order to carry out the agreement of exchange, the agreement providing that the farm should be delivered to Pettit, together with all personal property thereon, with certain minor

exceptions. There was evidence tending strongly to prove that in the negotiations leading up to said exchange Pettit and his agents represented to Cerriglio that the Pittsburgh property was worth $35,000; that it had a loan value of $16,000—*i. e.*, that the latter amount could be borrowed upon it—and that it had a rental value of $125 per month. In fact, the initial contract of exchange provided that Cerriglio should have a tenant paying a rental for the Pittsburgh property of $125 per month until April 1, 1909, while the truth was that Pettit was agreeing to pay that rent for the property himself, for the time named, as an inducement to Cerriglio to agree to the exchange being consummated, and that, too, in face of the uncontroverted facts that the Pittsburgh property had not at that time, nor down to the institution of this suit, a rental value of over $55 per month.

At the date of the initial agreement between these parties, December 19, 1908, Cerriglio had never been to Pittsburgh, and knew nothing of the values there. After this agreement had been signed, however, and before deeds were exchanged, Cerriglio went to Pittsburgh, spending a few hours there, but was with Pettit the entire time, and made no inquiry of others as to the value of the Pittsburgh property. While these parties were together on that occasion, Pettit reiterated his assurances as to the sale value, loan value, and rental value of the property, and these representations were given additional force and credit in the estimation of Cerriglio, doubtless, by the handsome and attractive appearance of the buildings; but not a word was spoken to him to put him on notice that values in Pittsburgh in that locality had entirely changed in late years, the result being a very great deterioration in both the saleable and rental values of properties there—a fact well known to Pettit. The property here in question, which had perhaps been worth many years prior the values placed upon it by Pettit, had declined until at the time of Cerriglio's visit to Pittsburgh it was worth no more, if as much as, $11,000. Instead of telling Cerriglio the truth as to the value of his property, Pettit made a number of artful suggestions as to the desirable location of his property, among them, that the neighborhood was the abode of millionaires.

At the beginning of these negotiations there was only a mort-

gage on the Pittsburgh property for $8,000, and it is true that before the exchange of said properties was closed Cerriglio applied to Thomas Cover (who held the $28,500 deed of trust on Hayfield) for a loan of $3,000 on the Pittsburgh property, to obtain the money with which to pay foreman Thompson for the personalty he had on Hayfield, and that Cover, after he and his son-in-law, Kern, an attorney at law, had visited Pittsburgh and inspected the property, declined to make the desired loan, reporting to Cerriglio the information obtained; but it is also true that Cerriglio immediately sought out Pettit and his then undisclosed agent, Harrison, and reported what had been told him by Cover and Kern, but here again Cerriglio was thrown off his guard and his apprehensions removed by Pettit telling him that Cover and Kern were entirely mistaken, and that he, who had lived in Pittsburgh all his life, knew much better as to values than they, and that the values stated to Cerriglio by him were true. The initial contract provided, as we have seen, that Cerriglio should be paid a rental for the Pittsburgh property of $125 per month, until April 1, 1909, and, when told what Cover and Kern had reported with respect to the property, Pettit not only said that they did not know what they were talking about, but, with the view, obviously, of inducing Cerriglio to believe that Cover and Kern were entirely mistaken, and that the values of the Pittsburgh property, as stated by him, were true, and should be relied on by Cerriglio, arranged himself the desired second mortgage of $3,000 on the property, which Cerriglio at the time thought, as he had every reason to think, was a *bona fide* loan, obtained through business channels, but which proved to be in fact a loan made by Pettit himself, the real truth of the transaction never coming to the knowledge of Cerriglio until months after his deal with Pettit had been closed.

The defense of Pettit does not rest to any extent upon a denial of the falsity of the representations charged to have been made by him to Cerriglio, but his endeavor is to justify his method of dealing by the defense that all he said was "trade talk," and by charging that the Hayfield property was not worth more than the deed of trust lien upon it. He does not seriously question that the Pittsburgh property was really worth no more than the mortgages upon it, and introduces no evidence to contradict statements

made by leading real estate agents of Pittsburgh and a large pro-
perty owner there, to the effect that the real value of the Pittsburgh
property in question at the time of its exchange for Hayfield farm
did not exceed $11,000, and that probably $10,000 would be the
best price that could be gotten for it, and that its rental value,
instead of being $125 per month, would not exceed $55 per month.

Cerriglio had been offered for Hayfield $35,000 but a short
time before the exchange with Pettit, which offer did not include
the personal property thereon, valued at $3,000; and it appears
from documentary evidence in the record that in the fall follow-
ing his taking possession of Hayfield, in January, 1909, Pettit was
pricing the farm and what was on it at $150,000, and gave extra-
vagant estimates of the productive character of the land, saying
that under proper management it would, at the price he put on it,
net the owner $15,000 or $20,000 per year; and in one or more
letters written by him, when he had owned the farm but ten months,
he declared it worth the price he had put on it, and to be the best
farm in Virginia, and that a part of it the year before had yielded
"98 bushels per acre." It is true that Hayfield had run down in
value while owned by Cerriglio, and that Pettit made considerable
expenditures upon it shortly after he became its owner; but there
is quite a difference in opinion among his witnesses as to the
amount so expended by him. He says that the amount was
$30,000, while the witnesses testifying vary widely as to these
expenditures, one of them putting his estimate of the amount as
low as $5,000. Be that, however, as it may, it is hardly possible
that an expenditure of even $30,000 on the Hayfield farm would
have brought its saleable value from $28,500 up to $150,000 within
ten or twelve months, and the productive character of the land up
sufficiently to have crops upon it worth $25,000 and yield to the
owner a net revenue of $15,000 or $20,000 per year.

The transaction which culminated in the exchange of properties
under consideration began with a business visit of Frank A. Har-
rison (upon whom Cerriglio was relying to obtain a purchaser for
Hayfield) to Pittsburgh for Ballard & Latham Co., with which
business Cerriglio was in no way connected. At this time Har-
rison met Pettit, and was requested by him to effect an exchange
of the Fayette street property for other property—a Virginia

farm desired. Thereupon Harrison listed this Pittsburgh property, and shortly after his return to Washington wrote Pettit, submitting a list of properties which he had for various parties, including in the list the Hayfield farm. This letter so much interested Pettit that he came to Washington, and within a week from the date of Harrison's letter the contract with Cerriglio here in question had been procured. During the negotiations leading up to this contract Pettit referred to Harrison, who vouched for Pettit's statements as to the Pittsburgh property. Months after the deal was closed Cerriglio learned that Harrison had represented Pettit as well as him (Cerriglio) in the transaction, and had received one-half of the commissions of $1,000 paid by Pettit for effecting the deal. While it is fair to Harrison to say that it seems to be conceded that at the time he honestly believed the Pittsburgh property was valuable, and worth much more than the liens against it, yet he, like Cerriglio, was deceived by the attractive appearance of the property, and, also like Cerriglio, had heard the extravagant and reckless estimates of its value repeated by Pettit. When Harrison learned the results of the deal to Cerriglio he returned to him the note for $750, received for his services in the transaction. It nevertheless appears that Harrison was the agent of Pettit, without the knowledge of Cerriglio, and vouched for the statements made by Pettit.

Cerriglio, as Cover, a witness for Pettit, testifies, "is a man easily imposed upon, and believes everything that is told him," and Harrison testifies that he represented both parties in this transaction, and, after stating how he brought them together, he corroborates Cerriglio in his statements as to how he was deceived as to the sale and rental value of the Pittsburgh property; that Cerriglio knew nothing of his (Harrison's) agency for Pettit, and declares that he was the party who influenced Cerriglio in making the deal, and, in effect, that he was led into doing so by the statements made by Pettit with respect to the Pittsburgh property, all of which he had repeated to Cerriglio, but found out afterwards to be unwarranted, as they were not in accordance with the truth.

The gravamen of Cerriglio's complaint is not so much what the property was worth which Pettit got from him in the exchange, but the fraud and deceit practiced upon him by Pettit with respect

to the property which he deeded to him (Cerriglio), and which he was led to believe had a sale value of $35,000, a loan value of $16,000, and a rental value of $125 per month, when, in truth, the property did not exceed in value $11,000, had no loan value at that time beyond $8,000 then secured upon it, and could not, as the real estate and business men testified, be rented for over $55.00 per month, the amount of rent obtained for it after strenuous efforts to obtain a tenant for it when it became vacant by reason of the expiration of the time for which Pettit was paying $125 per month.

After all the evidence in the case had been introduced, Cerriglio requested the court to give to the jury eight instructions, four of which were given, but Nos. A–6, A–7, and A–8 were refused, and A–2 given with an amendment, to which ruling amending A–2 and refusing A–6 and A–7 Cerriglio excepted.

It was sought by instruction A–2 to have the jury told that if they believed from the evidence that representations were made by Pettit as to the value of the Pittsburgh property, what it was renting for and would rent for, and as to the amount of loan that could be secured upon it, and that these representations were relied upon by Cerriglio, that same were material and without which Cerriglio could not conclude the transaction, and that the same were untrue, and known by Pettit to be untrue, then Cerriglio was entitled to a verdict in this action for such an amount, not exceeding the amount sued for, as in the judgment of the jury was right and proper under all the circumstances. The court gave this instruction, but with the proviso added to the effect that before a verdict could be found for Cerriglio the jury must further believe from the evidence that said statements were made as facts, not opinions of Pettit.

While it was not error to modify the instruction as asked, because too broad in its statement of the proposition of law it was intended to expound, the proviso added to the instruction would have been clearer and less calculated to mislead the jury had it gone further and to the extent of warning them against reckless statements of fact made in disregard of whether they were true or false.

Instruction A–6, which was refused, was to the effect that if the jury believed from the evidence that Cerriglio had not equal

means of information with Pettit in relation to the Pittsburgh property, and that, knowing this, Pettit made representations as to its value, what it was rented for, and what amount of loan could be procured upon the same, then if Pettit asserted that Cerriglio did not rely upon such representations, the evidence to show that he did not must be of the clearest and most satisfactory character, and not of mere inference or implication.

We are of opinion that the refusal of this instruction was error. The evidence as to the statements made by Pettit, referred to in the instruction, and Cerriglio's reliance upon them, is clear and positive. In fact, the record does not show that Pettit seriously denied that Cerriglio did rely upon said statements. Harrison, in his testimony, went to the extent of saying that he and Pettit seemed to be Cerriglio's masters in the transaction. While Pettit is shown to be comparatively a young man, it also appears that he has been a successful business man, had lived all his life in Pittsburgh, where he had acquired considerable wealth, and was skilled in the arts of trade. On the other hand, as we have seen, Cerriglio was a man pronounced by witness Cover as "easily imposed upon, and who would believe anything that was told him."

It is said by Staples, J., in *Grim* v. *Byrd*, 32 Gratt. (73 Va.) 293: "Even a matter of opinion may amount to an affirmation, and be an inducement to a contract, especially where the parties are not dealing upon equal terms, and one of them has, or is presumed to have, means of information not equally open to the other." *Rorer Iron Co.* v. *Trout*, 83 Va. 397, 2 S. E. 713, 5 Am. St. Rep. 285; *Buena Vista Co.* v. *Billmeyer*, 48 W. Va. 382, 37 S. E. 583.

In *Fitzgerald* v. *Frankel*, 109 Va. 603, 64 S. E. 941, the opinion by Harrison, J., says: "If the purchaser has not equal means of information with the seller, if it be a case in which he had the right to rely upon the representation, the evidence to show that he did not rely upon it must be of the clearest and most satisfactory character. In such cases there ought to be no room for inference or mere implication." Citing *Grim* v. *Byrd, supra.*

The fraud and deceit complained of in *Fitzgerald* v. *Frankel, supra,* was of the same character in all essential features as the fraud and deceit alleged in the case at bar, and here it is made to

appear that Pettit, who is charged with fraud and deceit, designedly led Cerriglio to rely upon the representations he (Pettit) made to him, for, when confronted with the opinion expressed by Cover and Kern as to the value of the Pittsburgh property, Pettit denounced the source of their information, and, to dispel any lingering doubt in Cerriglio's mind as to the truth of his representations, immediately procured for him a second loan of $3,000 on the Pittsburgh property, ostensibly arranging the same without difficulty by means of a telephone conversation carried on in Cerriglio's hearing, when, in truth, he was the only person willing to make the loan.

Instruction A–5, given for Cerriglio, was not broad enough to cure the error in refusing A–6.

Instruction A–7, also refused, was as follows: "The court instructs the jury that if they believe from the evidence that before and at the time of closing the said transaction Frank A. Harrison was in the employ of the defendant, to be paid and that he was thereafter paid a consideration by the defendant for his services in relation to the said transaction, and that such relationship existing between the said Harrison and the said defendant was unknown to the plaintiff, and not ascertained by him until long after consummating the said deal, that then any representations made by the said Harrison to the said plaintiff, prior to and at the time of the closing of the said transaction, in relation to the said Pittsburgh property, were made as the agent and in behalf of the said defendant, and that the defendant is bound by the same, to the same extent as if made by himself."

We have already referred to the evidence sufficiently to show that this instruction was intended to direct the attention of the jury to the question whether, under all the facts and circumstances of the case, they should find that Harrison was the agent of Pettit in the exchange of properties between Pettit and Cerriglio, without the knowledge of the latter; and that if the jury should so find, then, upon the principle of law that a principal is bound by representations of his agent, made either in the scope of his employment or in furtherance of the object for which he is employed, Pettit was as much bound by any false representations made by his agent, Harrison, to Cerriglio, with respect to the Pittsburgh

property, as if such representations had been made by Pettit himself.

The refusal of instruction A–7 was also error. *Ferguson* v. *Gooch*, 94 Va. 1, 26 S. E. 397, 40 L. R. A. 234; *Beury* v. *Davis*, 111 Va. 581, 69 S. E. 1050; 1 Ency. Dig. Va. & W. Va. 274, and cases cited. The fact that Harrison may have been honestly deceived by Pettit does not alter the case. If deceived, Harrison, as the evidence tended to show, in turn, and in the interest of Pettit, deceived Cerriglio, who looked upon Harrison as his trusted agent, and lent the ready ear of confidence to all he said and did in relation to the exchange of properties in negotiation.

The giving of instructions 1, 2, 3, and 4 for Pettit is assigned as error.

Instruction 1 told the jury that mere assertions by vendors of property as to its value or the price that has been offered for it are assumed to be so commonly made that purchasers cannot rely upon them, and they are understood as affording him no ground for neglecting to make examination for himself; that one relying upon such statements does so at his peril, and must take the consequences; that the mere expression of opinion in strong and positive language is no fraud, though it be false; and that such statements are not fraudulent in law, because they do not ordinarily deceive, but are considered as "trade talk."

The objection to this instruction is to that part of it which told the jury that assertions by a vendor as to the price he has been offered for property are assumed to be so commonly made that purchasers cannot rely upon them, etc. We are of opinion that this objection to the instruction is well grounded, for the reason that the instruction does not draw the distinction in law between a mere opinion as to what a certain piece of property is worth and the affirmation or statement by the vendor of the property, as an existing fact, that he has been offered a certain sum for the property, etc., which affirmation or statement proves to be false. The latter case is not in any way controlled by the rule respecting "trade talk" or "opinion utterances," but by the rule that when the vendor of property states that he has been offered a given sum for it, the statement is one of fact, as the chief element of the value of property is the readiness with which it may be sold. *Strickland*

v. *Graybill,* 97 Va. 602, 34 S. E. 475; *Fields* v. *Thomas,* 76 Va. 606; *Lake* v. *Tyree,* 90 Va. 719, 19 S. E. 787.

The weight of authority does not sanction the doctrine that one who has fraudulently deceived another, and thereby induced him to enter into a contract to his disadvantage, can successfully defend an appropriate action against him for the fraud and deceit by saying, "It is true that I, by fraud and deceit, induced you to enter into the contract, but you were negligent in not finding out that I was deceiving you, and, therefore, guilty of negligence in believing me."

"If one represents as true what he knows is false, in such a way as to induce a reasonable man to believe it, and the representation is meant to be acted on, and he, to whom the representation is made, believing it true, acts on it, and thereby sustains damage, there is fraud to support an action of deceit at law, and to found a rescission of the transaction in equity. Whether the misrepresentation is made innocently or knowingly, if acted on, the effect is the same. In the one case the fraud is actual; in the other it is constructive. * * *

"One to whom a representation has been made is entitled to rely on it *quoad* the maker, and need make no further inquiry." *Lowe* v. *Trundle,* 78 Va. 65, and authorities cited. See also 2 Va. L. Reg. 694, and authorities cited.

The same objection is urged to instructions 2 and 4, given for Pettit, that is made to instruction 1, just considered, with the additional objection that instructions 2 and 4 segregate some of the facts, calling particular attention thereto, and then tell the jury that if they find those facts from the evidence their verdict should be for the defendant.

These instructions lay stress upon the fact that Cover and Kern, after viewing the Pittsburgh property, reported to Cerriglio that Cover would not make a loan of $3,000 secured by a second mortgage on it, but leave out of view the transaction, testified to and practically uncontradicted, which took place after Cover and Kern had left Cerriglio, and in which Pettit and Harrison reiterated their assurances as to the value of the property, and Pettit's act in arranging the desired second mortgage loan, as a further assurance to Cerriglio that Cover's and Kern's estimate

of the value of the property was unreliable. There was no evidence tending to show that Cerriglio, after that transaction, made inquiry or received information from any one other than Pettit and Harrison. Under these circumstances the instructions should not have laid stress upon the statements made by Cover and Kern, and left out of view the evidence tending to prove the artifice of Pettit as to a second mortgage loan on the property, procured for the purpose of showing that the property had then a present actual loan value in excess of what Cover and Kern had said, and equal to the value put upon it by Pettit.

The grounds for assignments of error 5 and 6, which are founded upon bills of exceptions 5 and 6, will not be elaborated. Suffice it to say that the evidence to which the exceptions referred was irrelevant, and, if offered at another trial of the cause, should be excluded.

The trial court permitted, over the objection of Cerriglio, the witness Cover to state the circumstances under which he had placed a loan of $32,000 on the Hayfield farm in 1906, and how he was "tricked" into making the loan, which ruling is assigned as error.

We are of opinion that this assignment of error is well taken. The consideration which had induced Cover to make a loan upon Hayfield several years prior to the exchange agreement made between Cerriglio and Pettit, which is involved in this cause, and prior to Cerriglio's acquisition of any interest in Hayfield, was wholly irrelevant to the issue, and could have served no other purpose than to mislead the jury to a consideration of another transaction concerning Hayfield farm, alleged to have been brought about by fraud, but with which Cerriglio had no connection whatsoever.

There is no merit in the contention that Cerriglio too long delayed bringing this action, and, therefore, the doctrine of estoppel or waiver has no application to the case. Cerriglio did not find out until he went to Pittsburgh, in the fall of 1909, for the purpose of borrowing the money to pay the $3,000 loan which Pettit made him, the extent to which he had been deceived and defrauded with respect to the Pittsburgh property. His efforts to rent the place for something like $125 per month, which Pettit

69

said it would yield, were unsuccessful, and, as long distance telephonic communications had failed to get the money to pay the loan made by Pettit, he went to Pittsburgh to negotiate a loan on the property, when and where he learned, as he states, that he had been swindled. True he did not go at once into court, but took time, as he had the right to do, to inform himself as to whether or not he had any redress, and, when advised that he had a remedy at law, he brought this suit within a few months—to-wit, in May, 1910.

As the case has to go back for a new trial, we will not discuss the evidence further than has been necessary in considering the instructions to the jury given and refused at the last trial.

For the foregoing reasons, the judgment of the circuit court has to be reversed, the verdict of the jury set aside, and the cause remanded for a new trial to be had not in conflict with this opinion.

*Reversed.*