J. W. CREECH, INC., ET AL.

V.

NORFOLK AIR CONDITIONING CORPORATION

Record No. 860525

NORFOLK AIR CONDITIONING CORPORATION

V.

J. W. CREECH, INC., ET AL.

Record No. 860540

March 3, 1989

Present: All the Justices

*Robert C. Nusbaum (Thomas F. McPhaul; Hofheimer, Nusbaum, McPhaul & Brenner*, on briefs), for appellants. (Record No. 860525)

*Benjamin P. Lynch, Jr. (Taylor, Gustin, Harris, Fears & Davis*, on brief), for appellee. (Record No. 860525)

*Benjamin P. Lynch, Jr. (Taylor, Gustin, Harris, Fears & Davis*, on briefs), for appellant. (Record No. 860540)

*Robert C. Nusbaum (Thomas F. Mcphaul; Hofheimer, Nusbaum, Mcphaul & Brenner*, on brief), for appellees. (Record No. 860540)

RUSSELL, J., delivered the opinion of the Court.

This appeal arises from a construction contract dispute. It presents questions concerning responsibility for the additional cost of replacing damaged equipment, prejudgment interest, and remittitur.

In 1978, the Commonwealth, on behalf of Old Dominion University (ODU), engaged J. W. Creech, Inc. (Creech), as a general contractor to construct a new life science building at the ODU campus in Norfolk. The building is a complex, four-story structure containing environmental laboratories which simulate various climates encountered throughout the world. An essential part of the contract was the climate control system, which Creech awarded to a mechanical subcontractor, Norfolk Air Conditioning Corporation (Norfolk Air). Norfolk Air entered into various subsubcontracts for parts of its work.

Numerous disputes arose between Creech and Norfolk Air during construction, and the building was not turned over to ODU until January 1981, six months behind schedule. Even then, the architect did not grant final approval, and final payment was not made to Creech, until July 6, 1982. On that date, Creech owed Norfolk Air $66,926.05 on Norfolk Air's subcontract. Norfolk Air claimed an additional $23,142.16 for "extras." Creech claimed various credits and "back charges."

Norfolk Air brought this action in October 1982. The parties agreed that $66,926.05 was due to Norfolk Air on the basic subcontract, but disagreed with respect to claimed extras, credits, back charges, and interest. The case was tried to a jury. The jury returned several special verdicts which had been submitted by agreement of the parties. The court made certain adjustments to the verdicts and entered final judgment in March 1986. We granted appeals on the separate petitions filed by each party, and consolidated them for argument. The two appeals raise the three questions discussed below.

## I. THE EVAPCO COIL

Norfolk Air purchased from a materialman, and installed on the roof of the life science building, an evaporative condenser, called the "Evapco unit," for a system of coolers serving refrigerated boxes in the environmental laboratories. The Evapco unit contained a copper coil through which water was continuously circulated by a pump. In the fall of 1980, Norfolk Air suggested to the architect, through Creech, that an antifreeze solution should be introduced into the coil to prevent freezing. The architect informed Norfolk Air that freezing would not be a danger if the system was operating, because of the continuous circulation provided by the pump.

On Thanksgiving weekend, 1980, a team of specialists from California, employed by another subcontractor, was conducting a series of tests in the laboratories. On Friday evening, having failed to complete their tests, they asked D. W. Phelps, Norfolk Air's supervisor, if they might return on Saturday in order to complete their testing so as to be able to return to California. Phelps said, "[w]ell, I won't be here. So whatever you do, you'll have to shut [the pump] down when you leave."

When work on the job resumed on Monday, it was discovered that the system had been shut down, the water in it had frozen, and the coil had developed approximately 100 leaks. Creech told Norfolk Air to "immediately make the necessary repair so that the unit can be put into operation." Norfolk Air worked on the system over a period of months, attempting to repair the leaks. Eventually, Norfolk Air billed Creech $8,035.04 as an "extra," more than the cost of a new coil, for the repair work.

The contract made the architect the sole arbiter of what was to be billed as "extra" work, and what was to be included in the contract. The architect was also made the sole judge of satisfactory completion. The architect ruled that ODU was entitled to a new Evapco unit, not a repaired one, and refused to accept the installation after Norfolk Air had done its repair work. Norfolk Air then obtained a replacement unit from the supplier and installed it, billing Creech $7,338.13 as an additional "extra" for the cost of the new unit. The architect flatly refused to approve either the charge for repairs or the charge for replacement as an "extra."

At trial, over Creech's objection, the court submitted both "extra" claims to the jury. The jury's special verdicts found against

Norfolk Air on its claim for repairs, but awarded Norfolk Air $7,338.13 for the cost of the coil replacement. Creech assigns error to the court's ruling submitting those claims to the jury.

We think the court erred. Norfolk Air, because of the erroneous instructions to "shut [the pump] down when you leave," given by its superintendent to the laboratory testing team from California, was responsible for the damage. Further, under the terms of its contract, Norfolk Air was expressly made responsible for "work and equipment until finally inspected, tested, and accepted"; it was also required to "protect work against theft, injury or damage." Finally, Norfolk Air's contract provided: "If there is disagreement as to whether an item of work is an extra or a part of the contract, the Architects' and Owners' authorized agent's decision on the matter will be final and binding for all parties." As noted above, the architect ruled against Norfolk Air on this claim. Thus, as a matter of law, the problems with the Evapco coil were the responsibility of Norfolk Air, not Creech. The court erred in submitting the issue to the jury and we will reverse the judgment insofar as it includes this item.

## II. PREJUDGMENT INTEREST

At trial, Norfolk Air contended that it had been entitled to payment "by December, 1980," and that it was entitled to the amount of interest the claimed sum could have earned if timely paid and invested. Over Creech's objection, Norfolk Air introduced a savings certificate from a lending institution to show that long-term deposits earned interest at 15% per annum in July 1982. Creech contended that no interest should be allowed at all, and alternatively contended that interest, if allowed, should not begin to run until November 30, 1983, when Norfolk Air ultimately completed the payment of its sub-subcontractors. The court instructed the jury that its verdict might include "interest from the date payment was due and at the rate you determine." A verdict form was submitted to the jury which called prejudgment interest "delay damages." The jury filled in blank spaces on the form to provide for interest at 15% from July 6, 1982, the date ODU paid Creech in full.

Creech moved to set the verdict aside on the ground, among others, that 15% exceeded the rate permitted by Code § 8.01-382, which provides, in pertinent part:

Except as otherwise provided in § 8.3-122, in any action at law or suit in equity, the verdict of the jury, or if no jury the judgment or decree of the court, may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence.

The court initially ruled that the rate should be limited by the usury laws, (Code § 6.1-330.9, which set the "legal rate"), but upon further reflection concluded that because there had been no contractual obligation to pay interest, then Code § 6.1-330.10, which set the "judgment rate," was controlling. The General Assembly amends the judgment rate from time to time in response to changes in market rates. In accordance with those statutory changes, the court modified the rate of prejudgment interest and entered final judgment with interest at 10% from July 6, 1982, through June 30, 1983, and at 12% from July 1, 1983, until the date of judgment, March 19, 1986.

On appeal, Creech argues that no prejudgment interest should have been allowed at all, but if allowed, it should not have begun to run until November 30, 1983, when Norfolk Air's last subcontractor was paid, and the rate should not have exceeded the usury rate of 8%. Norfolk Air contends that the court erred in reducing the 15% rate fixed by the jury after hearing the evidence.

## A. ALLOWANCE OF INTEREST

Creech contends that a careful reading of the contract documents makes it clear that the parties did not contemplate the payment of interest in the event of delay. We do not consider that fact significant. Edmund Pendleton, the first President of this Court, observed in *Jones, Ex'r* v. *Williams*, 6 Va. 85, 87 (2 Call 103, 106) (1799), "interest is allowed, because it is natural justice that he who has the use of another's money should pay interest for it." The first sentence of Code § 8.01-382, quoted above, codifies this principle and leaves the assessment of interest in the discretion of the fact-finder.

## B. DATE FROM WHICH INTEREST RUNS

Creech contends that the court erred in permitting the jury to run interest from any date prior to November 30, 1983, the day on which Norfolk Air made final payment to its last unpaid sub-subcontractor. Norfolk Air was embroiled in litigation with its

sub-subcontractors throughout most of 1982 and 1983, and did not settle with those parties and pay the last one in full until November 30, 1983. Norfolk Air's subcontract provides: "Before issuance of the final payment the Subcontractor if required shall submit evidence satisfactory to the Contractor that all payrolls, material bills, and all known indebtedness connected with the Subcontractor's work have been satisfied." Norfolk Air did not, and could not, supply evidence of payment until November 30, 1983, because it had not paid its sub-subcontractors in full.

Conceding the truth of the foregoing, Norfolk Air nevertheless contends that its delay in paying its sub-subcontractors was Creech's fault. Creech had written letters to Norfolk Air in October 1980 and in February 1981, complaining of delays and additional expenses caused by Norfolk Air's sub-subcontractors. Norfolk Air was concerned that if it paid its sub-subcontractors before receiving payment from Creech, Norfolk Air would be exposed to the loss of any amount Creech might decide to deduct as delay damages.

At trial, Mr. J. W. Creech, president of the company during construction, testified that Creech had not in fact had a problem with the work of Norfolk Air's sub-subcontractors, and that the letters mentioned above were just "pep letters that I write all the time." He added, "[s]ometimes it does some good and sometimes it don't. But as a general contractor, you have to be after them all the time." Norfolk Air says that as soon as it discovered that this was truly Creech's attitude, it paid its sub-subcontractors in full, and that it would have paid them as soon as the job was completed in July 1982 if it had known that Creech was not seeking delay damages.

We need not decide the merits of this controversy. The conflicting evidence was submitted to the jury, which fully resolved the matter by its decision to run interest from July 6, 1982, the date when payment would normally have been due to Norfolk Air under the terms of the contract. On appeal, that factual determination is binding and will not be disturbed.

## C.  RATE OF INTEREST

Code § 8.01-382, quoted above, provides that the fact-finder may "provide for interest" and "fix the period at which the interest shall commence." This section is silent with respect to the appropriate rate of interest. Although we have never ruled with re-

spect to the rate which should be fixed, we observed in *Schwab* v. *Norris*, 217 Va. 582, 586, 231 S.E.2d 222, 225 (1977), that it was within the discretion of the fact-finder to fix the rate. The question remains whether that discretion is limited by law, and if so, what law applies.

■ We agree with the federal courts that have considered the question, that the jury's discretion in fixing the rate of prejudgment interest is not unlimited. *See Marsteller Corp.* v. *Ranger Const. Co.*, 530 F.2d. 608 (4th Cir. 1976). That part of the statute which provides for postjudgment interest, fixes the rate as provided by former Code § 6.1-330.10, and we do not consider tenable the rationale that by silence with respect to prejudgment interest, the legislature was willing to risk any injustices that might result from unfettered discretion in fixing the rate. We conclude that the jury's discretion is limited by the policy adopted by the legislature to control interest rates, except in carefully delineated areas.

■ If there is a statutory limit, to which statute do we look? Former Code § 6.1-330.9 (repealed and reenacted in 1987 as § 6.1-330.53) prescribes the "legal rate of interest." Before the 1987 reenactment, that rate was 6%, and was increased to 8% by the reenactment. The legal rate applies "where there is an obligation to pay interest and no express contract to pay interest at a specified rate." *Id.* The trial court concluded that the "obligation" referred to was contractual, not a duty imposed by law. The court deemed the "legal rate" inapplicable because the construction contract contained no obligation to pay interest. We agree.

The usury statute, former Code § 6.1-330.11 (repealed in 1987 and reenacted as § 6.1-330.55), prohibits, with many exceptions, contracts for the payment of interest at a rate greater than 8% (increased to 12% by the 1987 reenactment). That statute is also inapplicable because its operation is limited to contracts providing for the payment of interest.

■ Finally, former Code § 6.1-330.10 (repealed and reenacted in 1987 as § 6.1-330.54), as noted above, provides the judgment rate of interest which the legislature has adjusted from time to time to reflect market rates. We agree with the trial court's conclusion that it was this rate which the legislature intended to apply to awards of prejudgment interest made pursuant to Code

§ 8.01-382. This conclusion is reinforced not only by the mention of § 6.1-330.10 in the latter part of § 8.01-382, indicating that the judgment rate was within the contemplation of the framers of § 8.01-382 when that section was last under consideration by the General Assembly, but also by the inapplicability of the other interest-controlling statutes.

Most significant, in our view, is the 1987 repeal of Code § 6.1-330.10 and its reenactment, in modified form, as § 6.1-330.54. The new section contains an additional sentence, added by 1987 Acts, cc. 623 and 630, which provides: "Interest at the judgment rate, where no rate is fixed by the contract, shall apply to both prejudgment interest pursuant to § 8.01-382 and to postjudgment interest." Because of the inapplicability of the other interest-controlling statutes, we think the 1987 enactment was intended to dispel uncertainty by making explicit that which had been implicit in the former statutory scheme. In sum, therefore, we will affirm the trial court's rulings concerning prejudgment interest.

## III. REMITTITUR

Norfolk Air had engaged E.B. Rudiger & Sons, Inc. (Rudiger), as a sub-subcontractor to perform duct work. During construction, while inserting ducts through existing brick walls, Rudiger damaged the walls. Creech complained to Norfolk Air, and ultimately engaged a masonry subcontractor to repair the damage for an "extra" charge of $2,788.81. Creech paid this sum to the masonry subcontractor and "back charged" Norfolk Air for it. Norfolk Air "back charged" Rudiger. Rudiger, recognizing its responsibility, allowed Norfolk Air a credit for this item against the amount due on Rudiger's sub-subcontract. Thus, in effect, Norfolk Air collected this item from Rudiger for Creech's account, but then refused to give Creech credit for it when billing Creech for the amount due on Norfolk Air's subcontract.

W. M. Creech, who had become president of the corporation at the time of trial, testified to the circumstances giving rise to this claim against Norfolk Air. When he was asked whether Norfolk Air had, in effect, already collected this sum for Creech's account, the court sustained Norfolk Air's objection. Thus, the jury was unaware that Norfolk Air had been unjustly enriched by collecting the charge from Rudiger to protect itself against Creech's claim, and then refusing to pay it to Creech. The jury found

against Creech on this claim by failing to include it among the "back charges" allowed by its special verdict.

Creech made a post-trial motion to modify the verdict and introduced an affidavit from Rudiger, to the effect that Rudiger had allowed Norfolk Air credit for the $2,788.81 item claimed by Creech. There was no dispute concerning the facts. The court concluded that an injustice would result if Norfolk Air were permitted to retain the sum it had, in effect, collected for Creech's account. The court set aside the verdict to the extent of the disputed sum, subtracted $2,788.81 from the principal amount found by the jury to be due Norfolk Air, and entered judgment for the balance.

Norfolk Air appeals that ruling, contending that the Rudiger affidavit failed to meet the requirements for the admission of after-discovered evidence, as we have expressed them in *Fulcher* v. *Whitlow*, 208 Va. 34, 37-38, 155 S.E.2d 362, 365 (1967), and *Reiber* v. *Duncan*, 206 Va. 657, 663, 145 S.E.2d 157, 162 (1965). Norfolk Air points out that the facts in the affidavit were obviously known to Creech at trial because Creech unsuccessfully attempted to establish them by direct testimony.

Granted that the affidavit fails to meet the criteria for after-discovered evidence, we nevertheless think the court's ruling correct. The affidavit merely served as a reminder that an injustice would occur because of a ruling made at trial. The jury, not having the benefit of the undisputed facts, had by its verdict caused Norfolk Air to receive double payment for the item in question.

It is well within the discretionary power of the trial court to grant a remittitur to avert a clear injustice.

[W]hen it appears from the record before us that the trial judge made a finding that the verdict was plainly excessive and remittitur should be ordered and that, in reaching his conclusion, he considered factors in evidence relevant to a reasoned evaluation of the damages incurred and to be incurred, his order will not be disturbed on appeal if the recovery after remittitur bears a reasonable relation to the damages disclosed by the evidence. "Reasonableness" in this context is the standard by which the exercise of discretion must be tested in this Court.

*Ford Motor Co.* v. *Bartholomew*, 224 Va. 421, 435, 297 S.E.2d 675, 682 (1982) (quoting *Bassett Furniture* v. *McReynolds*, 216 Va. 897, 912, 224 S.E.2d 323, 332 (1976)).

The law has wisely placed in the hands of the trial judge the power to exercise his sound discretion in supervising the verdicts of juries to prevent miscarriages of justice. The law intends that this power should be exercised, and that the judge should be more than a mere referee between the litigating parties. The ultimate test, in a case of this nature, is whether or not the discretion has been abused.

*Smithey* v. *Refining Company*, 203 Va. 142, 148, 122 S.E.2d 872, 877 (1961). Finding no abuse of discretion in the court's ruling on this question, we will not disturb it.

Accordingly, we will reverse the judgment in part, and modify it by deleting $7,338.13 from the principal amount. In all other respects, the judgment will be affirmed.

*Reversed in part, modified,*
*and affirmed as modified.*