**Frances H. CONNELLY, Executrix of the Estate of Thomas M. Connelly, Plaintiff,**

v.

**GENERAL MEDICAL CORPORATION, and Steven B. Nielsen, Defendants.**

**Civ. A. No. 3:94CV637.**

United States District Court, E.D. Virginia, Richmond Division.

March 27, 1995.

John Tracy Walker, IV, Paul Wilbur Jacobs, II, Christian, Barton, Epps, Brent & Chappell, Richmond, VA, for plaintiff Frances H. Connelly, Executrix of the Estate of Thomas M. Connelly.

John Waller Harrison, Earle Duncan Getchell, Jr., Robert Luther Hodges, McGuire, Woods, Battle & Boothe, Richmond, VA, for defendants General Medical Corp., Steven B. Nielsen.

---

1. The Agreement was a standard form contract used by Rabco to delineate the terms of stock ownership. Dep. of Stuart Turner at 12.

2. The Agreement set the price for such a transaction at the value of "the adjusted shareholders

*MEMORANDUM OPINION*

SPENCER, District Judge.

Plaintiff Frances H. Connelly, as executrix of her deceased husband's estate, has sued General Medical Corporation and its chief executive officer, Steven Nielsen, for defrauding and misleading her in connection the sale of certain securities. Set for a one day jury trial on April 6, 1995, this case is currently before the Court upon the plaintiff's Motion for Leave to Amend and the defendants' Motion for Summary Judgment.

For the reasons stated herein, the Court will GRANT the plaintiff's Motion For Leave to Amend and GRANT the defendants' Motion for Summary Judgment.

## FACTS

A Virginia corporation, defendant General Medical Corporation ("General Medical") is one of the nation's largest distributors of medical and surgical products to hospitals. Compl. ¶ 5. General Medical is the successor-in-interest to Rabco Health Services, Inc. ("Rabco"), a Delaware corporation. *Id.*

Thomas M. "Tom" Connelly ("the decedent"), joined General Medical in 1976. *Id.* ¶ 7. In 1987, Rabco, a privately-held corporation, acquired General Medical as a subsidiary. *Id.* ¶ 8. Like many General Medical managers, or "partners" as they were known in Rabco parlance, the decedent purchased Rabco common stock after the acquisition, subscribing to 12,000 shares at $.01 per share. *Id.;* Dep. of Steven B. Nielsen at 24.

The decedent's ownership rights were governed by a March 31, 1987, stock subscription agreement ("the Agreement"). Compl. ¶ 10, Ex. 1.[1] Among other provisions, the Agreement entitled Rabco to purchase at a set price the entirety, but only the entirety, of the decedent's shares upon his death. Compl. ¶ 11, Ex. 1, at ¶ 2.2. To exercise this option, Rabco was required to provide written notice to the decedent's personal representative within six months of his death. Compl. ¶ 11.[2]

equity allocable to those shares as of the last day of the fiscal year immediately preceding" the decedent's death. Compl. ¶ 11, Ex. 1, at ¶ 2.2(a). The price for any given date was to be determined "on the basis of [Rabco's] consolidated balance sheet as of that date," subject to adjust-

The Agreement also contained a "clawback" provision. This clause was to apply if Rabco exercised its option on the decedent's stock and, within 550 days of that purchase, either (1) merged or consolidated with an unaffiliated entity, or (2) went public. Compl. ¶ 12, Ex. 1, at ¶ 2.7. In the event one of these situations came to pass, Rabco was obligated to pay the decedent's estate the same consideration the estate would have received from the merger or sale if the company had never exercised its option. Compl. ¶ 12. In other words, the Agreement gave the estate a form of stock price protection guarantee.

Finally, the Agreement granted Rabco a five-year purchase option. Compl., Ex. 1., at ¶ 2.5. This provision was similar to the six-month option in that it limited Rabco to purchasing not less than all of the estate's stock, and gauged the price for such a sale by reference to the adjusted shareholders equity. *Id.* This option could be exercised "[a]t any time after the fifth anniversary of the date of termination" of employment. *Id.*

The decedent occasionally discussed his Rabco stock with the plaintiff. Dep. of Frances H. Connelly at 67. She understood from these talks that "if the company was sold or if the stock went public . . . we would realize an amount of . . . money." *Id.* at 68. However, the plaintiff never pushed him to elaborate: "he never went into, and I didn't ask, I mean, that was business, and I just left it up to him." *Id.* Still, she was aware that efforts had been made to sell the company. *Id.* at 67.

The decedent died of an abdominal aneurysm on August 29, 1992. Compl. ¶ 8; Aff. of Frances H. Connelly ¶ 2. He had risen to the rank of Vice President at General Medical and, by virtue of additional subscriptions and stock splits, he owned 86,400 shares of Rabco common stock at the time of his death. Compl. ¶ 8–9. Named the executrix of the estate, the plaintiff hired an accountant to settle its affairs. F. Connelly Dep. at 19–22, 23–24. She had never personally made any

investment decisions or participated in stock transactions. F. Connelly Aff. ¶ 5. Thus, her 25 year-old son Brian, an insurance salesperson, coordinated the life insurance proceeds to ensure an income for his mother. Dep. of Brian Connelly at 4–5, 9–10.

On September 3, 1992, defendant Steven B. Nielsen, President and CEO of General Medical and Vice President and Member of the Board of Directors of Rabco,[3] wrote a letter of condolence to the plaintiff, assuring her that "you are very special and we want you to know that the Nielsen's [sic] and General Medical are here for you. Our love is a constant that you will always be able to count on." Pl.'s Brief in Opp. to Defs.' Mot. for Summ.J., Ex. 4, at 2. That same day, Nielsen wrote to Rabco Chairman Richard Bernstein and suggested that Rabco transfer the decedent's stock to the estate. *See* Mem. in Supp. of Defs.' Mot. for Summ.J., Ex. 4, at 1. Nielsen claims he wrote the letter to ensure that the "estate and [the Connelly] family were treated fairly by all concerned." Nielsen Dep. at 39–40. However, in the letter he told Bernstein that transfer would be both "an appropriate and proper gesture" of thanks for the decedent's contributions to General Medical, and "a profound statement of loyalty and trust to the remaining [General Medical] partners." Mem. in Supp. of Defs.' Mot. for Summ.J., Ex. 4, at 1.

Apparently, Bernstein initially dismissed the idea. Nielsen Dep. at 42. Eventually, however, Rabco's management elected to make a proposal to the estate. In February 1993, Nielsen was informed, either by Rabco's Executive Vice President, Treasurer, and Chief Financial Officer, Stuart Turner, or by its Vice President for Legal Affairs, James A. Cohen, that Rabco was willing to purchase only one-half of the estate's shares, provided that the estate waive its rights to merger or sale consideration as to those shares. *Id.* at 47. As Nielsen understood it, the estate would be entitled to keep the remaining one-half with all other rights under the Agreement. *Id.* He was asked to

---

ments for aggregate liquidation preferences, and accrued and unpaid dividends on Rabco's preferred stock. *Id.* at ¶ 2.6.

**3.** Nielsen is currently Chief Executive Officer and Chairman of the Board of General Medical. Compl. ¶ 6.

call the plaintiff "and act as an intermediary" between Rabco and the estate. *Id.* He recalls that he was to convey a sense of urgency in the request, that Rabco "wanted to meet with her and they wanted to do it relatively quickly." *Id.* at 57–58. This exigency arose from Turner's realization that Rabco's option under the Agreement was to expire on February 28. Dep. of Stuart Turner at 35.

Thus, on Thursday, February 25, Nielsen telephoned the plaintiff. Compl. ¶¶ 6, 14. In a five minute conversation, he told her to expect a letter from Rabco asking for her permission to purchase one-half of the decedent's shares. *Id.* ¶ 14; F. Connelly Dep. at 37; Nielsen Dep. at 54. Nielsen told the plaintiff that the proposal affected certain portions of the Agreement, and directed her to the specific paragraphs for her own perusal. Compl. ¶ 14; Nielsen Dep. at 55.

Nielsen told the plaintiff that, in his opinion, the estate should get all the stock. F. Connelly Dep. at 35; F. Connelly Aff. at ¶ 9. However, when the plaintiff asked Nielsen what he thought of the proposal, he responded that it was "a reasonable—reasonably good thing to do." Nielsen Dep. at 55. Nielsen asked that the plaintiff read the Agreement, and call Turner or Cohen if she had any questions. F. Connelly Dep. at 33; Nielsen Dep. at 56. He concluded by suggesting that she consult an attorney or financial advisor for input. F. Connelly Dep. at 36–37; Nielsen Dep. at 55.

Nielsen's telephone call was the first time anyone had mentioned the Rabco stock to the plaintiff since her husband's death. F. Connelly Dep. at 33. After talking to Nielsen, she located the Agreement and attempted to read it, highlighting the provisions that Nielsen had mentioned. *Id.* at 39; F. Connelly Aff. at 10. She had never seen the document before and apparently understood neither its terms nor what Nielsen was asking of her. Compl. ¶ 14; F. Connelly Dep. at 26, 35, 38, 41–44, 46.[4] She called her son Brian for advice, but since the Agreement was not in

front of him, he could not help her. F. Connelly Dep. at 47–48.

The anticipated letter arrived by Federal Express on Friday, February 26. F. Connelly Dep. at 55–56. Dated the day before, it bore Cohen's signature and indicated that Nielsen had been sent a copy. Compl., Ex. 2. In rather spartan fashion, the letter requested that the plaintiff consent to the following modifications:

1. That Section 2.2(a) of the Shareholders Agreements is hereby amended to provide Rabco with the option to purchase up to one-half of the shares owned by the shareholder (the "Purchased Shares").

2. Section 2.2(a) of the Shareholders Agreements is further amended so that the purchase price paid for the Purchased Shares shall not be subject to any adjustments pursuant to Section 2.7 of the Shareholders Agreements or otherwise. Rabco shall be relieved of any obligation it may have pursuant to Section 2.7 of the Shareholders Agreements.

3. Section 2.2(a) of the Shareholders Agreements is further amended to allow Rabco to extend its' [sic] option to purchase the shares from 6 months to 225 days.

4. Except as modified hereby, the Shareholders Agreements shall remain in full force and effect.

*Id.*, at 1–2. The letter offered no explanation or interpretation of the proposal.

The plaintiff read the letter but did not understand its import. Compl. ¶ 16; F. Connelly Dep. at 49; F. Connelly Aff. ¶ 11. Accordingly, she followed Nielsen's suggestion and contacted Stuart Turner's office, leaving a message for him to call. *Id.* Turner returned her call later that day. *Id.* The plaintiff remembers little of the ensuing twelve-minute conversation, except that Turner explained that the letter would allow Rabco to take back half of the estate's stock to give to more recent employees joining the firm. Compl. ¶ 16; F. Connelly Dep. at 49–

---

4. However, the plaintiff also stated during her deposition: "I don't know what I was thinking then. I probably understood it then. I can't honestly say right now. It's been almost two years." F. Connelly Dep. at 42. Given the procedural posture of this case, however, the Court will presume that she did not understand the Agreement or the proposed amendment.

53; F. Connelly Aff. ¶ 12.[5] Turner, though, recalls a conversation of much greater detail:

I spoke to Mrs. Connelly and told her that in the usual situation the company almost always opts to buy back all the shares. But considering the feelings everybody had had for Tom, that we would like to allow her the opportunity to keep part of the stock in perpetuity.

I further explained to her that in consideration of that—we would allow her to keep half in perpetuity, and in consideration of that we would buy back the other half with her giving up the rights to the 550 day protection plan. Price protection plan.

I explained to her that while there were no current transactions that were active, that clearly we had tried to go public twice before, which she knew about. And it was possible and maybe even probable that we would try it again in the future. Where it would be in the 550 day period or not, I couldn't say. But it could well be.

I said to her that while the company was not currently for sale, that certainly if somebody came along with the right price something like that could always happen and that she needed to carefully consider the offer that was being made, because she was giving up her 550 day protection on half the stock in order to keep the other half in perpetuity.

Turner Dep. at 39–37.

Turner also claims that he asked the plaintiff to consult a financial advisor or attorney. *Id.* at 37. While the plaintiff does not remember this portion of the conversation, F. Connelly Dep. at 63, she does recall telling Turner that because she was having difficulty understanding the proposal, she would talk it over with her family. F. Connelly Aff. ¶ 14. She never sought any professional advice on the matter, preferring instead "to discuss it over the weekend with [her sons]." F. Connelly Dep. at 48–49, 62–63. In particular, she wished to talk to Brian, the insurance salesperson. *Id.* at 46, 63. However, be-

cause she never gave him the Agreement or Rabco's February 25 letter to her, and never read those documents to him, *id.* at 47, Brian had no idea it was even "a proposal." B. Connelly Dep. at 12. As he remembers it:

I didn't know what was sent down to her [from Rabco]. In our conversations, I usually found out how the weather is and is there anything I can do for her. There wasn't anything of a technical nature that we talked about.

*Id.* Hence, although Brian had invested the proceeds of his father's life insurance policy, he gave the plaintiff no help digesting the Rabco proposal.

Under the terms of the written Agreement, Rabco's option to purchase the estate's shares was to expire on Sunday, February 28, 1993. According to Turner, however, the plaintiff orally agreed to waive this deadline:

I suggested that unfortunately, due to my schedule, I had let this come too close to the point in time when our option to buy back the shares would expire. But that I didn't want to pressure her. So that if she wanted, we could agree between us to extend our period of time to exercise that option so that she would have more time to consider the proposal I was making and not be rushed.

She agreed to that and that ended the phone call. Turner Dep. at 37–38.

On the morning of Monday, March 1, the plaintiff received a telephone call from James C. Robison, General Medical's Senior Vice President for Sales. Compl. ¶ 17; F. Connelly Dep. at 73. Robison told the plaintiff that Rabco needed her to sign the February 25 letter, and asked her to come to General Medical's Richmond office at 11:00 a.m. to sign the document. *Id.;* F. Connelly Aff. ¶ 16. Although she was upset, B. Connelly Dep. at 13, the plaintiff complied, and met with Robison and Keith Nedrow, General Medical's in-house counsel. Compl. ¶ 17; F. Connelly Dep. at 75.[6] She was accompanied

---

**5.** It was the company's standard practice to take the stock of former managers and retain them as treasury shares, reissuing them as needed "for replacement or for additional office[r]s." Turner Dep. at 32.

**6.** Nielsen had asked Nedrow to attend the meeting on his behalf. Nielsen Dep. at 61–62; Ned-

by her son. F. Connelly Dep. at 74; B. Connelly Dep. at 13.

During her deposition, the plaintiff described the meeting:

Q. Do you recall what was said in the meeting?

A. Okay. We did some small talk, what not. The letter that I was to sign, [Robison] went over briefly. I left it in their hands. He asked me to sign, I signed. We signed a couple of times. And that I was only going to get half; okay. Because my understanding was, again, other people were going to get it.

The one thing I do remember is that after everything was signed, and it just stuck in the back of my mind, was that the papers that were newly signed, they wanted them faxed to New York. And I didn't give it a second thought.

\* \* \* \* \* \*

Q. Do you recall saying that while you would have like to have kept all the shares, half was better than nothing?

A. Yeah.

F. Connelly Dep. at 76–77, 78. None of the attendees recall any other substantive discussions at this meeting. F. Connelly Dep. at 75–78; B. Connelly Dep. at 16; Dep. of James C. Robison at 12–13;[7] Dep. of Keith Nedrow at 35–44. Thus, the plaintiff left General Medical's office with the following understanding of the situation:

As far as we all understood was that I had [X]-amount of shares of privately owned stock that, at the moment, was negligible for, you know, the amount—monetary amount, and that some day down the road, if the company does something, you know, we would—we would have some money.

And that's all we knew. That's all—we left it at that.

F. Connelly Dep. at 80.

On March 17, 1993, Cohen sent the plaintiff a letter purporting to exercise Rabco's option to purchase 43,200 shares. Compl., Ex. 3; F. Connelly Dep. at 81. Rabco considered the shares to be worthless at current value; nonetheless, it was willing to remit half of Tom's initial investment of one penny per share:

Pursuant to Section 2.2(a) and 2.6 of the Stock Agreement, the purchase price is specified to be equal to the Adjusted Shareholder's Equity applicable to these shares. As of the last date of the fiscal year immediately following the end of the employment, there was a common shareholder's deficit and, therefore, no equity attributable to the Estate's shares of the Company's Common stock. A schedule of the Adjusted Shareholder's Equity is attached hereto. However, the Company is returning to you the initial investment for such shares of $675.00 as the purchase price for the shares.

Compl., Ex. 3. Cohen informed the plaintiff that by tendering its check, Rabco had completed its purchase of the 43,200 shares, and that the shares had been canceled. *Id.* He concluded by asking the plaintiff to execute a Stock Power form he had enclosed with the letter. *Id.* On March 25, the plaintiff complied, transferring the shares to Rabco. Compl. ¶ 21; F. Connelly Dep. at 81.

During this period, Rabco Chairman Bernstein and the General Medical senior management[8] were embroiled in a long-simmering feud. General Medical had been the topic of frequent buyout rumors in the late 1980s, but such speculation had ceased in 1991, when Rabco twice unsuccessfully attempted to take General Medical public. Nedrow Dep. at 66–68, 72–73. Reading the market from Richmond, the senior manage-

---

row Dep. at 35–36. Robison was not familiar with the contents of the Rabco proposal. Nedrow Dep. at 39. However, because he and the plaintiff knew each other, he was asked to sit in to make her feel comfortable. *Id.* at 39–40.

7. Robison has no memory of the encounter whatsoever. Robison Dep. at 12–13.

8. This term refers to Nielsen, Nedrow, Robison, Bruce Glickstein, and James Warren. In addition, two others figures named Fatzinger and Garber, no longer with General Medical, occupied peripheral roles. Aff. of G. Keith Nedrow ¶ 4.

ment believed that Bernstein's reputation had been so sullied by the failure of these initial public offerings that he would have trouble selling General Medical to anybody. *Id.* In December 1992, the senior managers unanimously advised Bernstein that he should find a way to sell the company. Dep. of Brian J. Fatzinger at 10; Nielsen Dep. at 46. Bernstein took that as a vote of non-confidence. Fatzinger Dep. at 10. Thus, by the end of 1992, the senior management was at "loggerheads" with Bernstein and the New York office. Nielsen Dep. at 20–21. In their opinion, Rabco "was heading into extinction under [Bernstein's] ownership." *Id.* at 20.

Like the decedent, the senior managers had entered into subscription agreements with Rabco in 1987. *Id.* Between them, they held less than ten percent of the Rabco stock. Nedrow Aff. ¶ 4. However, because Rabco was privately held, their shares were "essentially worthless unless we went public or the company was sold." Fatzinger Dep. at 28. It was not unusual for the senior management to rue privately that their agreements were valueless as long as Rabco was heading in the wrong direction. *Id.* at 28–29; Nielsen Dep. at 21.

By March 1993, it was obvious that Bernstein and Nielsen had differing visions for General Medical's future, and that corporate growth was impossible as long as this schism impeded high-level decision making. Nedrow Dep. at 78. Consequently, the senior managers still "had no real expectation of ever being able to realize any value from the shareholder agreements" they held. *Id.* In mid-March, and without Bernstein's knowledge, they sought legal advice regarding their rights under the agreements.[9] Finally, after a March 25, 1993, meeting with counsel, they first began to consider staging a take-over of General Medical. *Id.* at 73–75, 80–81.

This nascent thought came to fruition on August 31, 1993, when a consortium of senior managers and financial investors completed a $300 million leveraged buyout of General Medical, merging the company into a subsidiary of GM Holdings, Inc. Compl. ¶ 23; Nedrow Dep. at 62; Nielsen Dep. at 76–77.[10] Any person holding a shareholder agreement received $20 per share for their Rabco common stock. Compl. ¶ 23. As a result, Nielsen and the other senior managers finally realized the value of their stock. Nielsen Dep. at 76–77. And, because the estate still owned 43,200 shares of Rabco common stock, the plaintiff received a check for $875,829.30 on September 3, 1993. Compl. ¶ 25. Of course, but for the plaintiff's decision to modify the Agreement, the estate would have received twice that sum: the merger occurred less than 550 days after Rabco exercised its option on the decedent's stock, and the "claw-back" provision otherwise would have applied. Compl. ¶ 23.

Citing this chain of events, the plaintiff has sued General Medical and Nielsen, asserting claims for (1) securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (West 1981), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. 240.10b–5 (1994); (2) fraud, under the common law of Virginia; and (3) breach of fiduciary duty. She also contends that this Court should declare void the March 1, 1993, amendment to the Agreement and rescind her tender of shares to Rabco. All told, she seeks $875,829.30 in compensatory damages, exclusive of interest and costs.

Jurisdiction is appropriate pursuant to 28 U.S.C.A. §§ 1331 and 1367 (West 1993).

## THE PLAINTIFF'S MOTION FOR LEAVE TO AMEND

The Court must first decide whether the plaintiff should be granted leave to amend her complaint to allege additional facts, and "clarify her allegations based on information that came to light during discovery." Pl.'s

---

9. According to Nedrow, neither he nor Nielsen adequately understood their rights under the Agreements. Nedrow Dep. at 77. Nielsen, however, contends that he "had a pretty good understanding" of the Agreements, Nielsen Dep. at 25, and states that they merely sought out a lawyer to confirm their suspicion that the Agreements gave them "no real rights." *Id.* at 73.

10. Thus, General Medical is Rabco's successor-in-interest and a real party in interest for this litigation.

Mot. for Leave. to Am. at 1. The defendants oppose this motion.

In the main, the plaintiff's clarifications take the form of additional facts, all designed to underscore the allegedly fraudulent nature of the Agreement modification. However, the plaintiff does wish to withdraw both her claim for punitive damages and her allegation that the defendants failed to tell her to consult a lawyer or a financial advisor. Finally, she wishes to charge General Medical with actual fraud and Nielsen with constructive fraud.

## I. *Standard of Review*

■ Discretion to deny leave to amend is limited by the dictate of Federal Rule of Civil Procedure 15(a) that "leave shall be freely given when justice so requires," and by the general policy, embraced by the Federal Rules, favoring resolution of cases on their merits. *See Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.), *cert. dismissed*, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980). A court may not "use its discretion either arbitrarily, or in a way that undermines the basic policy of the rule." *Id.* The Supreme Court has identified the general standard to be employed by federal courts:

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *accord Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279 (4th Cir.1987); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir.1986) ("leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment may be futile"). Absent any specifically resulting prejudice, or any obvi-ous intent to harass the opponent with dilatory tactics, delay alone does not support denying a motion to amend. *Piper Aircraft Corp.*, 615 F.2d at 613.

## II. *Discussion*

■ The plaintiff claims that her new allegations were unearthed during discovery, which she maintains was an inordinately sluggish process. She stresses that her underlying theories of liability having remained essentially unchanged. Accordingly, she reasons, the proposed amendment is proper because no prejudice can befall either defendant.

In the defendants' eyes, however, the proposed amendment would be highly prejudicial. The plaintiff filed her motion three days before the end of discovery, just as the defendants were polishing their summary judgment motion for submission to the Court. Because they relied upon the original complaint to prepare their motion, the defendants apparently fear that this relatively late amendment will forestall any consideration of the merits of this case. They also contend that an amendment would require additional discovery.

In *Island Creek Coal Co.*, the trial court had denied the plaintiffs leave to amend their complaint, relying, in part, upon the belief that the allegation of a totally new claim calling for additional discovery would unfairly prejudice the defendant. 832 F.2d at 280. The Fourth Circuit reversed, noting that the facts supporting the new count were well known to the defendant. Said the court:

> [The defendant's] experts had extensively investigated and discovered those facts. These experts had testified about such facts in their depositions . . . [T]he motion did not, therefore, take the defendant by surprise or require it to investigate a claim of which it was not already cognizant. In fact, the defendant's experts testified in their depositions why they thought any claim such as the plaintiffs proposed to assert could not be sustained. On the face of this record, the defendant is hardly in a position to argue that the granting of the amendment would be prejudicial to it in

forcing it to investigate and prepare to defend [such a] claim. This contention of the defendant is further- undermined by the fact that the defendant argued that the allowance of the amendment would have been futile.

*Id.*

The instant matter is quite similar. In fact, the case for granting the plaintiff's motion is even more compelling here, where she proposes additional facts, not a fresh theory of liability. Because these facts came to light during the depositions of probable defense witnesses, the defendants cannot claim to be unfairly surprised.[11] Nor is there reason to extend discovery.[12]

A court may deny a motion for leave to amend when the plaintiff unduly delays raising new allegations. For instance, in *The Equity Group, Ltd. v. Painewebber, Inc.*, 839 F.Supp. 930 (D.D.C.1993), *aff'd*, 48 F.3d 1285 (D.C.Cir.1995), the court refused to permit the pleading of new allegations, citing the plaintiff's decision to wait several months after defendant filed summary judgment motion. *Id.* at 932. In this case, by contrast, there has been no appreciable delay.

The most that could be considered prejudicial about the proposed amendment is that the defendants premised their motion for summary judgment upon the original Complaint. But that means little. Granted, it is not an abuse of discretion to deny a party leave to amend and add a new claim where the motion to amend was interposed "at the eleventh hour, after discovery was virtually complete and the [defendant's] motion for summary judgment was pending before the court." *Roberts v. Arizona Bd. of Regents*, 661 F.2d 796, 798 (9th Cir.1981); *see also Local 472, United Ass'n of Journeymen v. Georgia Power Co.*, 684 F.2d 721, 724–25

(11th Cir.1982); *Equity Group,* 839 F.Supp. at 932. But in this case the plaintiff has simply raised new factual contentions. The Court can easily stir these new allegations into the analytical brew of this case and still apply the same controlling legal principles. Thus, the defendants will not be unduly prejudiced by the proposed amendment. *See Sandcrest Outpatient Servs. v. Cumberland Cty. Hosp.*, 853 F.2d 1139, 1148–49 (4th Cir. 1988) (suggesting in *dictum* that an amendment "to add more particularized or newly discovered facts" might be proper).

The defendants have been unable to produce evidence of undue prejudice and bad faith. Hence, all that remains as a bar to the amendment is the defendants' last contention—that the amendment is futile. Since the Court is already presented with a motion for summary judgment that requires examination of the merits of this case, it exacts little additional energy to accord the same scrutiny to all the plaintiff's allegations, both old and new. In any event, a plaintiff confronted with a charge of futility need not prove each and every element of the count involved. *Island Creek Coal Co.*, 832 F.2d at 280. "It is sufficient that they demonstrate that there is some plausible basis in the record for their claim." *Id.*

Accordingly, the Court will GRANT the Motion for Leave to Amend and decide this case based on all the evidence.

## THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. *Standard of Review*

Under Rule 56(c), a motion for summary judgment may be granted "only if the pleadings, depositions, interrogatory answers, admissions, and affidavits show 'that there is no

---

**11.** The plaintiff's lawyers sent a copy of the proposed Amended Complaint to the defendants' counsel on February 16, 1995. Defense counsel offered their suggestions regarding the proposed complaint, some of which were incorporated into the final document submitted on February 21. Pl.'s Reply. Br. in Supp. of Mot. for Leave to Am. at 2.

**12.** The defendants' curiosity has been piqued in one area: the plaintiff's personal knowledge of her new found facts. However, since the allega-

tions clearly arise from deposition testimony, the answer ought to be readily apparent. There is no evidence that the plaintiff had previously knowledge of these allegations but suppressed them for production at a later date. If she had an independent basis for her allegations, she logically would have included them in her original Complaint. That she did not indicates that the defendants already know all they could possibly discover on this issue.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Magill v. Gulf & W. Indus., Inc.*, 736 F.2d 976, 979 (4th Cir.1984) (quoting Fed.R.Civ.P. 56(c)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir.1992). "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v. Lee*, 943 F.2d 366, 368 (4th Cir.1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

The party moving for summary judgment always bears the initial burden of informing the Court of the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Any inferences "drawn from the underlying facts contained in the materials before the trial court must be viewed in the light most favorable to the party opposing the motion." *Helm v. Western Md. Ry.*, 838 F.2d 729, 734 (4th Cir. 1988). Only after the movant's burden is met, and a properly supported motion is before the Court, must the party opposing the motion "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)); *accord Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir.1991). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in 56(c), except the mere pleadings themselves." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

## II. *Securities Fraud*

In Count I, the plaintiff charges that the defendants committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. The statute makes it unlawful for any person

to use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rule and regulations as the Commission may pre-

scribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.A. 78j(b). Invoking this rule-making authority, the Commission promulgated Rule 10b–5, which forbids the making of

any untrue statement of a material fact or [the omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5(b). Consequently, to survive a motion for summary judgment on a claim of securities fraud, the plaintiff must show a genuine issue of material fact as to four elements: (1) that the defendants made a false or misleading statement of material fact; (2) with scienter; (3) upon which the plaintiff reasonably relied; (4) that proximately caused the plaintiff's damages. *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir.1994); *Malone v. Microdyne Corp.* 26 F.3d 471, 476 (4th Cir.1994); *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260–61 (4th Cir.1993); *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir.1991); *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991), *cert. denied sub nom. Schatz v. Weinberg*, 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992).

While she initially identified eight misleading statements or omissions in her Complaint, that total ballooned to seventeen in the Amended Complaint. For the purposes of the defendants' summary judgment motion, however, she raises sixteen, categorized into eight groups. They are:

A) Failing to disclose that the senior managers had unanimously advised Richard Bernstein to sell General Medical in December, 1992 (Amended Compl. ¶ 33(n));

B) Failing to disclose that the senior managers were concerned about securing the value of their own Rabco stock and were exploring ways to do so prior to asking the plaintiff to enter into the modification of the Shareholder Agree-

ment (Amended Compl. ¶ 33(b), (k)–(m), (p));

C) Failing to disclose that the senior management of General Medical in Richmond was at "loggerheads" with the Rabco management in New York and desired to separate from Rabco (Amended Compl. ¶ 33(*o*)–(p));

D) Misstating that, under the Amended Shareholders Agreement, the plaintiff would own half of the stock into perpetuity, when the February 25 letter did not waive Rabco's five year purchase option;

E) Misstating that the amendment to the Agreement was in the plaintiff's best interest (Amended Compl. ¶ 33(h));

F) Failing to disclose that Nielsen did not clearly understand the terms of the Shareholder Agreement when he advised her to agree to the proposed modification or that Robison was unfamiliar with the modification (Amended Compl. ¶ 33(i)–(j));

G) Failing to disclose fully the risks and implications of entering or not entering into the amendment to the Agreement (Amended Compl. ¶ 33(c)–(d), (f)–(g));

H) Failing to disclose, on March 1, 1993, that the Rabco shares had vested and Rabco was giving no consideration for the modification (Amended Compl. ¶ 33(e)).

Claims E and F merit swift disposition, for the plaintiff has failed to demonstrate a genuine issue of material fact as to either of these contentions. To begin with, Claim E falls flat on its face. The Court finds no evidence suggesting that the plaintiff was told the proposed amendment was in her best interest. Indeed, she torpedoed this allegation during her own deposition:

Q. Other than the conversations we've already discussed, can you recall any specific conversation where somebody said it would be in your best interest to sign this document?

A. In those specific words, I don't recall. I—they asked me to sign, and I willingly signed.

F. Connelly Dep. at 82. The record is devoid of evidence that she was *ever* told that the amendment was in her best interest. To the contrary, the plaintiff's only basis for this allegation is her own faith that "these people knew Tom, and they would know in my best interests or our best interests as family. So whatever they said, I figured they knew more than I did." *Id.* at 71. But the plaintiff offers no rationale for resting Section 10(b) liability upon her subjective and unexpressed belief.[13] As a result, summary judgment is appropriate on Claim E.

Claim F likewise fails, as to both Robison and Nielsen. The plaintiff contends that she should have been told about Robison's unfamiliarity with the Agreement. This is entirely unpersuasive. There is no evidence that Robison and the plaintiff engaged in a substantive discussion about the Agreement, and no evidence that the plaintiff relied upon his judgment. Thus, summary judgment is appropriate.

The plaintiff's allegations about Nielsen meet the same fate. True, Nielsen did not understand every clause in the Agreement, and sought legal advice to confirm his suspicions that it held no value absent a sale or merger. Yet he undoubtedly understood the issues of which he and the plaintiff spoke. Nielsen knew that Rabco was willing to purchase only one-half of the estate's shares, provided that the estate waive its rights to future consideration. He also was aware that the estate would keep the remaining one-half with all other rights intact. In addition, his comment to the plaintiff that he would have preferred to see the estate receive all the stock makes clear that he comprehended the limits of the proposed amendment. Moreover, Nielsen communicated at least the bones of the proposal to the plaintiff; her highlighted copy of the Agreement proves that Nielsen correctly indicated the clauses to be altered. Since Nielsen's understanding of these matters was complete,

---

**13.** The evidence most closely related to this claim is Nielsen's statement that the amendment was "a reasonably good thing to do." However, as shown below, *infra* at 1118, this statement was an inactionable opinion.

thereby negating any false or misleading statement, the plaintiff's allegations of securities fraud must be dismissed.

The Court will address the plaintiff's remaining claims seriatim.

### A. The Defendants' Nondisclosures

#### 1. *Failure to Disclose the Possibility of a Sale or Merger*

The plaintiff's first three groups of allegations, claims A–C, challenge the defendants' alleged failure to disclose the possibility of a sale or merger occurring within the next 550 days. The defendants, however, claim that any such omissions were not material.

 The plaintiff must establish the materiality of any omitted information, for an incomplete statement is not actionable if it is otherwise insignificant. *Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988). A statement is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in [making his decision]." *Walker v. Action Indus., Inc.,* 802 F.2d 703, 706, n. 6 (4th Cir.1986) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987). Put another way, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1448 (5th Cir.1993); *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132.

 Materiality must be judged in the context of the statement. *Rubinstein v. Collins,* 20 F.3d 160, 168 (5th Cir.1994). A mixed question of law and fact, it is generally inappropriate for resolution on summary judgment. *Cooke,* 998 F.2d at 1262 (citing *TSC Indus.,* 426 U.S. at 450, 96 S.Ct. at 2132). Indeed, "[s]ummary judgment is *only* appropriate where no rational finder of fact could conclude that the alleged misrepresentations and omissions were material." *McCormick v. Fund American Companies, Inc.,* 26 F.3d 869, 875 (9th Cir.1994) (emphasis added).

The plaintiff argues that a reasonable investor would want to know both of the disputes brewing between the senior managers and Rabco, and that the idea of separating the businesses had begun to germinate. Certainly this position has some merit. The estate's "claw-back" rights, which the plaintiff ceded to Rabco in the amendment, had no value unless a sale or merger occurred within the next 550 days. Since any assessment of the plaintiff's options had to rest heavily on speculation about the future, a reasonable investor in her position would want to know as much as possible.

That being said, it defies logic and contravenes the facts of this case to suggest that the defendants concealed plans to sell General Medical from the plaintiff. No reasonable juror could find that the defendants were contemplating or actively seeking to sell the Company at the time the plaintiff signed the amendment to the Agreement. Granted, Rabco twice attempted to take General Medical public in 1991, and the senior management did tell Bernstein that they favored selling the company in December 1992. Yet nothing in the record suggests that Bernstein heeded this advice at the time, or that he took it as anything but a vote of no-confidence. In fact, the advice of the senior managers meant little when Bernstein "couldn't find a way to take the company public or find a buyer that was of interest to him." Fatzinger Dep. at 10. In late February and early March 1993, the future of General Medical was anybody's guess. As a result, to assail the defendants for failing to disclose their feelings about the future is to demand mere supposition.

In assessing the materiality of such speculative judgments about future events, the Court must balance "both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Milton v. Van Dorn Co.,* 961 F.2d 965, 970 (1st Cir.1992) (citing *Basic Inc.,* 485 U.S. at 238, 108 S.Ct. at 987).

In *Taylor v. First Union Corp.,* 857 F.2d 240 (4th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989),

the Fourth Circuit held that Section 10(b) "impose[s] no obligation on defendants to disclose highly tentative merger discussions prior to [a] plaintiff's sale of her stock." *Id.* at 242. The occurrence of "preliminary, contingent, and speculative" merger discussions is not a material event in the absence of an "agreement as to the price and structure of the deal" or "the factual [or] legal predicates for a merger." *Id.* at 244. Where these elements are lacking, the proposed merger is too "fickle and changeable" a situation to impose an obligation of disclosure. *Id.* This rule, said the court, protects both the company and the shareholder:

> The materiality of information concerning a proposed merger is directly related to the likelihood the merger will be accomplished; the more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision. Information of speculative and tentative discussions is of dubious and marginal significance to that decision. To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to "bury the shareholders in an avalanche of trivial information"; the very perils of the limit on disclosure imposed by the materiality requirements serves to avoid.

*Id.* at 244–45.

*Taylor* makes clear that the plaintiff's allegations do not articulate material omissions. The senior managers had, at most, only begun to form embryonic ideas about the sale of General Medical. They certainly had no formal agreements; indeed, no talk of a leveraged buyout surfaced until March 25, 1993, after the plaintiff had tendered her stock to Rabco. Moreover, neither the factual nor the legal predicate for such an event was in place. There is no evidence suggesting that the senior managers could bring about a sale simply by recommending it to Bernstein. Instead, the event became possible only after the senior managers sought

legal advice about their subscription agreements. This first happened in mid-March 1993, over two weeks after the plaintiff signed the amendment to the Agreement.

Attempting to avoid summary judgment, the plaintiff points to a purported factual dispute over the date the senior managers first conceived of a buyout. She rests this argument upon Fatzinger's recollection that he and Nielsen had a conversation "sometime between [late January] and the first part of March," during which Nielsen admitted seeing a lawyer "to potentially find a white knight for General Medical that would replace Richard Bernstein." Fatzinger Dep. at 12–14. However, Fatzinger's dim memory was conclusively rebutted by other affiants and deponents, who indicated that the first meeting with counsel did not occur until March 17 at the earliest, and that the idea of a buyout was not raised until March 25. *See* Aff. of John O'Grady, ¶¶ 2–3; Aff. of Wellford L. Sanders, Jr., ¶¶ 2–3; Nedrow Dep. at 73–75; Nielsen Dep. at 73, 75. This evidence establishes that Nielsen's tête-à-tête with Fatzinger could not have occurred as early as Fatzinger thought. More importantly, the buyout plans did not become material developments until after the plaintiff had agreed to the modification she now challenges.

In the alternative, the plaintiff attempts to cabin *Taylor* to cases involving publicly-traded entities, arguing that closely-held corporations, such as Rabco, "have a duty to disclose preliminary merger intentions and other forward-looking information." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ.J. at 24. This argument rises from the Seventh Circuit's decision that the so-called "price and structure rule"[14] does not apply to closely-held corporations. *Michaels v. Michaels,* 767 F.2d 1185 (7th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986). Applying *Michaels,* the Seventh Circuit has held that "a [closely-held corporation's] decision to seek another firm with which to merge may be the sort of material information that must be disclosed to [an] investor selling his shares." *Jordan v. Duff*

---

14. Under that rule, noted in *Taylor,* 857 F.2d at 244, "merger negotiations do not become material until the merging companies agree on both price and the post-merger structure." *Michaels,* 767 F.2d at 1195.

& *Phelps, Inc.*, 815 F.2d 429, 431 (7th Cir. 1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988).

The plaintiff's reliance upon *Michaels* and *Jordan* is misplaced. While these cases may have expanded the duty to disclose, they did not eviscerate the requirement of materiality. More pointedly, they do not mandate the disclosure of every pre-merger occurrence. Instead, the Court still must balance the likelihood of the event and its probable magnitude. In this case, however, there was no "event" that could be predicted, let alone measured. Unlike *Jordan*, in which the board of directors resolved itself in favor of a merger, here the plaintiff can point only to internal dissension between the General Medical senior management and its superiors in New York. This is not evidence of a material fact, even in the Seventh Circuit.

Because it is only through hindsight that the plaintiff can spot the evolution of a merger, that prospect was, as a matter of law, "too incipient for a jury to find [it] material." *Hartford Fire Ins. Co. v. Federated Dept. Stores, Inc.*, 723 F.Supp. 976, 990 (S.D.N.Y. 1989). To the extent the plaintiff's securities fraud claims rest on these three omissions, then, the Court will enter summary judgment for the defendants.

### 2. Failure to Disclose the Risks and Implications of the Proposed Amendment

In claim G, the plaintiff argues that the defendants failed to inform her (1) that whether Rabco exercised its option or not, the Agreement gave the estate rights to future consideration if Rabco was sold or purchased within 550 days; (2) that Rabco's option would expire on February 28, after which she could not be forced to sell the estate's stock; (3) that she was waiving her rights to future consideration on the 43,200 shares she sold back to Rabco; and (4) that the estate's rights under the existing Agreement "were more valuable" than the rights retained under the modification.

The materiality of this information is apparent; it is axiomatic that a reasonable investor would assign importance to the terms and consequences of the modification proposal. However, the defendants cannot be held liable for omitting even a material fact unless they owed the plaintiff a duty of disclosure. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc.*, 485 U.S. at 238 n. 17, 108 S.Ct. at 987 n. 17; *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980); *accord Hillson Partners*, 42 F.3d at 219; *Schatz*, 943 F.2d at 490; *see also* 2 Thomas L. Hazen, *Treatise on the Law of Securities Regulation* § 13.10, at 161 (2d ed. 1990) ("Mere nondisclosure, absent insider trading or some other collateral activity, is insufficient to establish a violation"). The courts are stalwart in policing the duty to disclose, because

> [t]he limitless scope of nondisclosure invites those with hindsight to allege fraud based on nondisclosure of nearly anything that later comes to the surface, or is thought to lie beneath it.

3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud and Commodities Fraud* § 12.3, at 271 (2d ed. 1994). Thus, the duty to disclose must arise from "a fiduciary or other similar relation of trust and confidence" existing between the parties outside securities laws. *Schatz*, 943 F.2d at 490.

The plaintiff advances several theories why she was owed such a duty. For the present, however, those arguments can be set to one side, for the defendants owed no obligation to disclose information that was already in the plaintiff's possession.

The plaintiff essentially contends that the defendants should have interpreted the Agreement and modification proposal for her. In other words, she is attempting to shift the burden of understanding the document onto the defendants. But the Court knows of no such obligation under the federal securities law.[15] That the plaintiff may have been too

---

**15.** The plaintiff argues that this alleged duty arose from their "affirmative representations ... concerning the attractiveness of the modification offer." To create a duty to disclose, however, those representations must have been inaccurate, incomplete, or misleading. *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26–27 (1st Cir.1987). Here, the only such representation was Nielsen's

unsophisticated to engage in such a major transaction is irrelevant, for that fact imposes no duty upon the defendants to explain their proposal in greater detail. "Rule 10b–5 does not protect nondisclosed facts equally known *or available* to both parties." *Sailors v. Northern States Power Co.,* 4 F.3d 610, 613 (8th Cir.1993) (internal quotation omitted, emphasis in original). The issue is not what the plaintiff actually understood, but what she had the ability to understand; if the plaintiff had access to the information she now complains was withheld from her, she cannot prevail:

> When the means of knowledge are open and at hand or furnished to the purchaser or his agent and no effort is made to prevent the purchaser from using them … he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor.

*Id.* at 614 n. 3 (quoting *Shappirio v. Goldberg,* 192 U.S. 232, 241–42, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904)).

There is no indication in the case at bar that the defendants possessed greater access to the terms of the proposal than the plaintiff. She had the Agreement in hand, and was thrice guided to the relevant provisions, by Nielsen on Thursday, by Cohen's letter on Friday, and again by Turner later that day. Moreover, she was advised at least once to consult an attorney or financial advisor. The defendants cannot be accused of fraud simply because the plaintiff disregarded that recommendation. This is especially so when the plaintiff failed to pursue the option she ostensibly did select, failing to discuss the matter with her son, and never providing him with copies of the Agreement and the proposed amendment.

The plaintiff responds that the defendants somehow obstructed her access to advice by "forcing" a decision on the Monday, having presented her with the written proposal on the Friday. These cries of foul are uncon-

vincing. The plaintiff was fully capable of seeking independent advice when the defendants recommended it, and could have refused to attend the Monday signing session at the General Medical headquarters. It is quite significant that she did not. Absent any suggestion of duress, or signs that the defendants dissuaded the plaintiff from seeking competent counsel, the Court will not let their liability rise or fall on their eagerness to close the deal.[16]

The plaintiff also charges that the defendants failed to advise her that the estate's rights under the existing Agreement "were more valuable" than the rights retained under the modification. This contention cannot stand. First, as a matter of law, the plaintiff is not entitled to demand an opinion from the defendants; whatever the defendants' relationship with the plaintiff, they owed no such duty to lend counsel.

Moreover, there was no basis for the opinion she desired. The wisdom of her choice was dependent upon the occurrence of a sale, merger or successful public offering within 550 days. But as the Court has already held, these events were entirely speculative. No one, no matter how sophisticated, could divine the ultimate value of the alternatives the plaintiff faced. Because "an inability to see into the future does not constitute securities fraud," *see Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1132 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994), the court will enter summary judgment for the defendants on this claim.

3. *Failure to Disclose on March 1, 1993, that Rabco's Option had Lapsed and that Rabco was Giving No Consideration for the Modification*

 In claim H, the plaintiff charges the defendants with withholding the news that their option to purchase the estate's shares had expired on February 28. Once again, the plaintiff attempts to hold the defendants

---

statement that the offer was a "reasonably good thing to do." There is no evidence that this was a deceptive statement.

**16.** Particularly when the deal, *ex ante,* was favorable to the estate. This is not a case in which the defendants preyed upon a suspecting victim. To

the contrary, all the evidence indicates that they attempted to enrich the plaintiff by giving the estate something to which it would ordinarily not be entitled—the right to retain one-half of the decedent's stock.

liable for her failure to investigate a document she did not understand.

The plaintiff cites the complexity of the agreement as an excuse for failing to understand this provision. However, the Agreement's option period, referenced in the February 25 letter, was quite clear:

> If the Shareholder's employment terminates as a result of his ... death ..., the Company shall have the option (exercisable by notice to the Shareholder or his personal representative at any given time within six months after the date of termination of employment) to purchase ...

Compl., Ex. at ¶ 2.2. Because she highlighted this provision on her copy of the Agreement after speaking with Nielsen, it is indisputable that she had notice of its terms. Hence, the defendants had no duty to disclose a matter so readily ascertainable to the plaintiff. "A fortiori, if the party has the information in question, he can not complain of its nondisclosure to him." 1 Bromberg & Lowenfels, *supra*, § 4.4, at 175–76.

Further, the plaintiff can point to no prior misleading statements about the option period that would trigger a duty to speak. *See Taylor*, 857 F.2d at 243–44 ("Rule 10b–5 imposes such a duty to disclose only when silence would make other statements misleading or false"). This fact dooms the plaintiff's claim that she should have been told that Rabco was providing no consideration for the modification.

As with her previous claims, the plaintiff has failed to establish a basis for liability. Accordingly, summary judgment is appropriate.

## B. The Defendants' Affirmative Misrepresentations

### 1. *"We would allow her to keep half [the stock] in perpetuity"*

■ In Claim D,[17] the plaintiff charges that Stuart Turner falsely told her that the estate would own half of the stock "into perpetuity." In fact, says the plaintiff, Rabco retained its five year purchase option in the amended agreement.

The defendants contend that this allegation "is both an afterthought and a red herring." Defs.' Repl.Br. in Supp. of Defs.' Mot. for Summ.J. at 6. Frankly, it is hard to miss the irony of the plaintiff's claim. She has limited recollection of the conversation in which this statement was allegedly made, and urges the Court to ignore this dialogue whenever it tends to damage her claim. For example, the Court is admonished to block its ears when Turner remembers explaining the proposal in detail and advising the plaintiff to talk to an attorney. However, the plaintiff is quick to draw attention to the one moment in which she claims Turner misspoke.

Putting that aside, the claim fails nonetheless. A statement is not a lie simply because the plaintiff believes it to be so. In order for Turner's words to be a false and misleading statement of material fact, there must be some cloud on the plaintiff's right of ownership "in perpetuity." For Rabco's five year option to pose such an obstacle, however, there had to be a demonstrated possibility that the company would exercise it. The record does not support such a proposition. Indeed, there is no evidence that Rabco intended to exercise the option, or even understood that it could. The option could only be used to purchase "all but not less than all" of the estate's stock. Under the defendants' reading of that clause, the option became inoperative when the plaintiff permitted Rabco to purchase only half of the stock.[18]

Further, this claim undermines the plaintiff's theory of the case. In every other allegation, she suggests that the General Medical senior managers deliberately misled her about the possibility of a buyout and the value of waiting for such an event, ostensibly to minimize their buyout costs by limiting the

---

17. This claim is raised in the plaintiff's opposition brief but not in either of her complaints. In the interests of finality, however, the Court will address the claim.

18. Of course, the contract could also be read, and perhaps more logically ought to be read, to allow Rabco to purchase "all but not less than all of the stock held by the estate at the time the company exercises its five year option." The question is of no consequence, however, since the plaintiff's claim fails for other reasons.

estate's rights to future consideration. Now, for the first time, she contends that Turner deliberately induced her to enter into this agreement.

Why? Turner was obviously not part of the senior management cabal, and had no indication that their buyout attempt was in the cards. Moreover, the amendment was really not in Rabco's interest. It already had the right to redeem all of the stock from the estate, subject only to the chance that Bernstein might eventually find a buyer. Granted, by "inducing" the plaintiff to enter into the agreement, Rabco minimized that exposure, but at the cost of diluting corporate ownership. Rabco lost control of over 40,000 shares of its stock, shares that ordinarily could have been offered to another employee to anchor his loyalty to the company.

In short, there can be only two plausible explanations for Turner's actions, only one of which can be true. First, perhaps Turner honestly believed that Bernstein could sell or merge Rabco at some point within the next 550 days. However, no one thought this likely. As Turner himself put it: "Clearly there was no mind set to sell the company." Turner Dep. at 45. No, the only permissible conclusion is that Turner acted in good faith. He presented the idea to the plaintiff because "Tom Connelly had been perhaps the single most beloved employee at General Medical [and c]ertainly that was a feeling shared at Rabco in New York." Turner Dep. at 27–28. Consequently, the claim that Turner fraudulently induced the amendment is incoherent and insupportable. It will be dismissed.

### 2. The Amendment was a "reasonably good thing to do"

■ Finally, the Court is left with Nielsen's comment to the plaintiff when she asked for his advice. While the plaintiff has not *per se* identified this as a false and misleading statement of material fact, it bears the most resemblance to her otherwise baseless claim that she was told the Rabco proposal was in her best interest. As such, it merits as a cursory review. And nothing more.

Nielsen's statement was an opinion, not a statement of fact. Applying Section 14(a) of the Securities and Exchange Act, the Supreme Court has held that such a statement of belief can be actionable only "as a misstatement of psychological fact of the speaker's belief in what he says," *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095, 111 S.Ct. 2749, 2759, 115 L.Ed.2d 929 (1991), and must be supported by objective evidence of its falsity. *Id.* at 1096, 111 S.Ct. at 2760. Here, however, the plaintiff has offered no evidence that Nielsen found the proposal unreasonable, and no evidence that, at the time the proposal was made, it was anything but fair. Absent a genuine issue of material fact that Nielsen lacked good faith or a reasonable basis for his opinion, the plaintiff cannot press this claim under the securities laws. *See Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1277 (D.C.Cir.1994).

For the reasons stated, the Court will enter summary judgment in favor of the defendants on Count I of the plaintiff's Amended Complaint.

### III. State Law Claims

■ The Court must now decide whether to resolve the plaintiff's remaining claims. When a court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over the remainder. 28 U.S.C. § 1367(c)(3). While the Court has dismissed the federal securities fraud claims from this case, a balance of relevant factors, including judicial economy, convenience, fairness, and comity, favors a consolidated judgment. *See McCullough v. Branch Banking & Trust Co.,* 844 F.Supp. 258, 260–61 (E.D.N.C.1993), *aff'd,* 35 F.3d 127 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1101, 130 L.Ed.2d 1069 (1995). At this point, in the later stages of this proceeding, the parties have invested enough time and effort in this matter. Foisting them off on the state judiciary would be unfair and unwise, especially in light of the futility of the plaintiff's state law claims. Accordingly, the Court will exercise its discretion to hear the supplemental claims of fraud, breach of fiduciary duty, and rescission. *Cf. Ciro, Inc. v. Gold,* 816 F.Supp. 253 (D.Del.1993) (after dismissing federal securities law claims on motion to dismiss, refusing

to exercise supplemental jurisdiction over state law claim of breach of fiduciary duty).

## A. Common Law Fraud

■ The plaintiff's charges of common law fraud will meet the same fate as her federal claims. To hold General Medical liable for actual fraud, the plaintiff must show that Rabco (1) made a false representation, (2) of a material fact, (3) intentionally and knowingly, (4) with intent to mislead, and that (5) the misrepresentation induced the plaintiff's reasonable reliance, (6) causing a resulting injury. *Diaz Vicente v. Obenauer,* 736 F.Supp. 679 (E.D.Va.1990); *Winn v. Aleda Constr. Co.,* 227 Va. 304, 315 S.E.2d 193 (1984). Given the similarity between these elements and those of a Section 10(b) claim, for reasons already stated, the Court will grant summary judgment on the plaintiff's allegations in Count II.

In support of Count III, the plaintiff argues that a reasonable finder of fact could conclude that Nielsen committed constructive fraud by stating that the Rabco proposal was a "reasonably good thing to do." The Court is unconvinced. Constructive fraud ordinarily "cannot be predicated upon what amounts to a mere expression of an opinion." *Piedmont Trust Bank v. Aetna Cas. & Sur. Co.,* 210 Va. 396, 171 S.E.2d 264, 267 (1969). Indeed, an opinion is only actionable when it is both materially false and "the parties are not dealing upon equal terms, and one of them has, or is presumed to have, means of information not equally open to the other." *Nationwide Ins. Co. v. Patterson,* 229 Va. 627, 331 S.E.2d 490, 493 (1985) (quoting *Cerriglio v. Pettit,* 113 Va. 533, 75 S.E. 303, 308 (1912)). Here, of course, the plaintiff has produced no evidence suggesting that Nielsen's declaration was materially false.

Moreover, the Court has already held that the plaintiff was capable of securing competent advice about the proposal. That she did not is not Nielsen's cross to bear. *See First Nat'l Exch. Bank v. Johnson,* 233 Va. 254, 355 S.E.2d 326, 329 (1987) (merely failing to understand or knowingly sign a document "is wholly insufficient to establish the duty necessary to support a finding of constructive fraud"). That being the case, the Court will grant summary judgment on all of the plaintiff's fraud claims.

## B. Breach of Fiduciary Duty

■ In Count IV, the plaintiff maintains that Nielsen owed her a fiduciary duty, and breached it by making the representations discussed above. While the Court's disposition of Counts I and III indicates that there has been no breach, Nielsen also questions the basis for such a duty.

The existence of a fiduciary duty is ordinarily a question of fact. *Allen Realty Corp. v. Holbert,* 227 Va. 441, 318 S.E.2d 592, 595 (1984)). The duty arises "when special confidence has been reposed in one who in equity and in good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *Id.; accord Myers v. Finkle,* 950 F.2d at 168. The *Myers* court held that, given the following evidence, a reasonable trier of fact could find that a fiduciary relationship had been created:

> the plaintiffs were social friends of [the defendant] and other partners of [the defendant's] firm and ... members of the firm spent considerable amount of time working closely with the [plaintiffs] on business matters ... [The firm] rendered accounting services to [the plaintiffs] for four years prior to the initiation of the investment transactions and served as their accountants for a total of at least ten years.

950 F.2d at 168. In *Allen Realty,* the Virginia Supreme Court ruled similarly when confronted with allegations that a corporation had retained an accounting firm to liquidate its real estate. 318 S.E.2d at 595. It could reasonably be inferred, said the court, that the accountant actually performing these tasks was under a fiduciary duty to inform the corporation of any offers made on the land. *Id.* at 595–96.

■ Here, however, no reasonable juror could conclude that Nielsen owed the plaintiff such a duty. An older Virginia case is particularly instructive. In *Hancock v. Anderson,* 160 Va. 225, 168 S.E. 458 (1933), two rather unsophisticated sisters relied

upon the investment advice and counsel given by their bank's cashier. When it became clear that the cashier also represented a conflicting interest, and that the sisters had suffered financially in the deal, the women sued, arguing that the cashier was liable to them for breaching a confidential trust. In rejecting the claim, the Virginia Supreme Court stated:

> Trust alone . . . is not sufficient. We trust most men with whom we deal. There must be something reciprocal in the relationship before the rule can be invoked. Before liability can be fastened upon one there must have been something in the course of dealings for which he was in part responsible that induced another to lean upon him, and from which it can be inferred that the ordinary right to contract had been surrendered.

*Id.,* 168 S.E. at 463.

Against this background, plaintiff's claim must fail. Her sole evidence that Nielsen owed her a fiduciary duty comes from the condolence letter he sent her in September 1992. The plaintiff avers that this letter induced her trust and confidence, with the result that later she accepted his opinion about the proposed amendment to the Agreement. But Nielsen simply told the plaintiff that "the Nielsen's [sic] and General Medical are here for you. Our love is a constant that you will always be able to count on." This is a statement of compassion, not an invitation to follow Nielsen's investment advice. It is a far cry from the inducement required to create a fiduciary bond between the speaker and audience on matters such as the Rabco proposal.

The plaintiff attempts to distinguish *Hancock* by noting that the defendant there expressly disavowed a confidential relationship by disclosing that he worked for a conflicting interest. However, this evidence factored less in the court's calculus than the cashier's exhortation that the plaintiff should seek the advice of another professional. Said the court, "[t]hat he should have advised her to consult with one of the most alert business men of Richmond is out of keeping with any purpose to defraud." *Id.*

In this case, of course, Nielsen acted in precisely the same manner, informing the plaintiff that she should consult an attorney or financial advisor. F. Connelly Dep. at 36–37; Nielsen Dep. at 55. In any event, Nielsen was under no obligation to disclose the obvious; the plaintiff was abundantly familiar with his ties to Rabco. Thus, she was on notice that Nielsen was not her representative in the Rabco deal; for her to believe otherwise was irrational. One letter and one brief telephone conversation are not the breeding ground of a fiduciary duty.

■ On another front, the plaintiff contends that Nielsen is her fiduciary as a matter of Delaware law. As the director of Rabco, a Delaware corporation, Nielsen would have created a fiduciary duty if he took advantage of inside information and deliberately misleading an ignorant shareholder to her detriment. *See Caballero v. Anselmo,* 720 F.Supp. 1088, 1099 (S.D.N.Y.1989) (citing cases). As the *Caballero* court itself held, though, this rule has no application if "[the p]laintiff has not produced any evidence establishing that [the defendant] took advantage of inside information to mislead [the] plaintiff." *Id.* Since the facts advanced by the plaintiff fail to raise genuine issues of material fact on either of these elements, the Court is persuaded that Nielsen owed no fiduciary duty to the plaintiff. Therefore, his Motion for Summary Judgment on Count IV will be granted.

### C. Rescission

Finally, the plaintiff seeks to set aside the amendment to the Shareholder Agreement and gain future consideration for the stock she sold to Rabco. She claims, *inter alia,* that the amendment is the product of fraud and misrepresentation, and is therefore unconscionable, unfair, and lacking in consideration. She also argues that she did not give her knowing assent to the modification. After a thorough review of the record, and in light of the Court's resolution of those issues already discussed, the Court finds no merit to the plaintiff's contentions, and will therefore enter summary judgment for the defendants.

## CONCLUSION

In this case, a relatively unsophisticated shareholder, trying to recover from the recent loss of her husband, took the inadvisable step of entering into a major securities transaction without fully understanding the deal. The resulting misfortune, the estate's inability to double its take on the ensuing buyout, makes for an outwardly harsh result. But these facts do not change the law applicable to this case, under which the plaintiff must shoulder the blame.

The proposal Rabco made to the plaintiff was not one-sided or unfair. Although Rabco regularly redeemed stock held by the estates of former employees, the company offered the plaintiff an alternative: the estate could keep one half of the stock, provided the plaintiff agreed to waive all rights to future consideration on the other. As a result, the estate had the hope of one day selling those 43,200 shares for market value, instead of ceding them back to Rabco for a pittance.

Of course, viewing the transaction through the distorting haze of the subsequent buyout, the proposal appears to be less favorable. The estate would have profited handsomely had the plaintiff rejected the modification, whether Rabco purchased the estate's stock or not. But "hindsight reaction to an improvident sale ..., based upon nondisclosed facts equally known or available to both parties, ordinarily [will] not be considered within the protective basis of Rule 10b–5." *Myzel v. Fields*, 386 F.2d 718, 736 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). "The securities law approach matters from an *ex ante* perspective." *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir.1992).

From that viewpoint, it is clear that the plaintiff was in a better position to avoid any misconception. Had the Court authored the February 25 letter, perhaps it might have explained the proposal in greater detail. On the other hand, the plaintiff was told to contact Rabco officials for further explanation, and professional advice was suggested. But not once did the plaintiff seek to delay the process or manifest her reluctance to sign. For all the defendants knew, the woman who walked into the General Medical building on March 1 was fully informed and quite capable of entering into the modification agreement. As the plaintiff herself said, "they asked me to sign, and I willingly signed." F. Connelly Dep. at 82. These are not circumstances indicative of fraud or sharp practices.

Accordingly, and for the reasons stated, the Court will GRANT the defendants' motion for summary judgment.

An appropriate Final Order shall issue.

### FINAL ORDER

THIS MATTER is before the Court upon the plaintiff's Motion for Leave to File an Amended Complaint and the defendants' Motion for Summary Judgment. Upon due consideration, and for the reasons set forth in the accompanying Memorandum Opinion, the Court hereby GRANTS both motions. The Clerk is DIRECTED to file the plaintiff's Amended Complaint. The Court hereby enters judgment on that complaint in favor of the defendants.

And it is SO ORDERED.